843 A.2d 365 (2004)
367 N.J. Super. 462
I/M/O Grant of Renewal Application of the RED BANK CHARTER SCHOOL, Monmouth County.
Superior Court of New Jersey, Appellate Division.
Argued February 3, 2004.
Decided March 17, 2004.
*368 R. Armen McOmber argued the cause for appellant (McOmber & McOmber, attorneys; Mr. McOmber, on the brief).
Kimberley Lake Franklin, Deputy Attorney General, argued the cause for respondent State Board of Education (Peter C. Harvey, Attorney General, attorney; Ms. Franklin, on the brief).
David C. Apy, Newark, argued the cause for respondent Red Bank Charter School (McCarter & English, attorneys; Mr. Apy, of counsel and on the brief).
Richard A. Friedman, Camden, argued the cause for Amicus Curiae, New Jersey Education Association (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Mr. Friedman, of counsel and on the brief; Edward M. Suarez, Jr., on the brief).
Philip G. Gallagher argued the cause for Amicus Curiae, American Civil Liberties Union of New Jersey (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Gallagher and Lawrence S. Lustberg, on the brief).
Greenberg Traurig, attorneys for Amicus Curiae, Excellent Education For Everyone (Sara Beth Lewis and Briscoe R. Smith, of counsel; Ms. Lewis, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and LEFELT. *366
*367 The opinion of the court was delivered by LEFELT, J.A.D.
The Red Bank Board of Education opposed the renewal and expansion of the charter for the Red Bank Charter School, arguing, along with several other arguments, that the school's operation had worsened the racial/ethnic imbalance in the district schools. After conducting a site visit, interviewing several Charter School representatives, and reviewing the reports and other documents that had been assembled, the Commissioner approved the renewal and expansion. The Red Bank Board appealed to the State Board of Education. The State Board affirmed the Commissioner, and the Red Bank Board further appealed to this court.
In deciding the appeal, we harmonize "the public policy of [this] State to encourage and facilitate the development of charter schools," N.J.S.A. 18A:36A-2, with our strong "policy against racial discrimination and segregation in the public schools," Jenkins v. Tp. of Morris Sch. Dist., 58 N.J. 483, 495, 279 A.2d 619 (1971), and affirm the charter renewal, but remand to the State Board for the Commissioner to conduct a hearing to consider whether certain enrollment and other practices by the Charter School exacerbate the district's racial/ethnic imbalance.

I.
After setting forth the facts and procedural history, we address the segregation argument, followed by several additional *369 arguments the Red Bank Board advanced in seeking reversal of the Charter School's renewal and expansion. We begin with the pertinent facts and relevant procedural history.
The Red Bank Charter School is a public school managed by a board of trustees and operated independently of the local Red Bank Board of Education under a charter granted by the Commissioner of Education. N.J.S.A. 18A:36A-3; N.J.A.C. 6A:11-1.2. The first year of the school's operation was 1998-99.
On October 1, 2001, the Charter School, which had been serving 80 students in fourth through eighth grades, applied to the Commissioner for renewal and expansion of its initial charter, pursuant to the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18, and the regulations adopted under that Act, N.J.A.C. 6A:11-1 to -7.3. Besides renewal of its charter for five additional years, N.J.S.A. 18A:36A-17, the school sought to add kindergarten through third grade and to increase the enrollment of its existing fourth through eighth grades. The expansion would approximately double the size of the charter school to 162 students.
On November 1, 2001, the Red Bank Board filed detailed opposition to the Charter School's application, arguing, among other items, that the school had "exacerbated de facto segregation" in the district schools and that a hearing should be granted "to fully assess the negative impact of the continued existence and proposed expansion of the Red Bank Charter School prior to taking any action."
The Board specifically pointed to data showing that since the Charter School opened, the percentage of non-minority students enrolled in the Board's schools had decreased from 32% to 18%. Although the Charter School had only 1/4 of the number of students as the Red Bank Middle School, the Charter School had more non-minority students enrolled (46), than the Red Bank Middle School (44). The 2001-02 Red Bank Middle School's fourth grade class was comprised of 90% minority students. In 2002, the Charter School had almost twice as many non-minority students in a single fourth grade class of 16 students than the Red Bank Middle School had throughout all of its fourth grade classes.
Under the pertinent regulations, the Commissioner must conduct a "comprehensive review" before granting a charter renewal. N.J.A.C. 6A:11-2.3(b). To assess the charter school's performance as part of the comprehensive review, a "structured interview" must be conducted. N.J.A.C. 6A:11-2.3(b)(9). In accordance with the regulations, on November 29, 2001, the Department of Education conducted a day-long "structured interview" and site visit of the Charter School.
As part of its evaluation, the Department of Education invited the Charter School to respond to the Board's objections. The school responded and supplied supplemental information on December 6, 2001. The Board objected to the supplemental information and, in the alternative, asked for permission to respond. The Board contends that the Commissioner failed to acknowledge its objection or alternative proposal.
In response to the Commissioner's request, the Charter School asserted that "the loss of white children from the Board's schools is due in large part to white children attending private schools, parochial schools and home schooling." The Charter School further asserted that "`white flight' was occurring long before the Charter School opened its doors; and that the continued erosion in the racial demographics of the Board's schools is the *370 result of dynamics that originally commenced in the 1960s and the poor quality of education provided in its schools."
Besides considering the documents that had been submitted by the Charter School and the Board together with the results of its structured interview and site visit, the Department of Education also reviewed an evaluation of the school that it had commissioned by KPMG. This evaluation concluded that "By all measures, [the Charter School] has met with significant success both academically and as a dynamic learning community."
After the Commissioner finished the review, he renewed the school's charter and permitted the expansion. The Commissioner based his approval on "the school's academic progress, faithfulness to the terms of the original charter and the school's thorough examination of its results to guide improvements." The Commissioner made no mention of the Board's segregation charges in his renewal letter.
Upon administrative appeal by the local Board, the State Board of Education affirmed the Commissioner and concluded that the Board had not "demonstrated that the Charter School has had a segregative effect on the district's schools or that expansion of the School will have an impermissible impact on the racial composition of the district's schools."
No stays were granted, and the expanded Charter School is currently serving 162 students in kindergarten through eighth grade. The local Board filed a timely appeal with this court.

II.
The following sections address the several arguments pressed by the Board in its efforts to reverse the Charter School's renewal and expansion. We start with the segregation argument.
The Board complains that because the Commissioner breached his duty to investigate, detect, and remediate the segregative effect of the Charter School, we must reverse the State Board and close the school. The Charter School counters by asserting that the racial/ethnic imbalance found in the other district schools is caused by factors unconnected to the Charter School.
On the appeal, with our permission, three amici curiae filed briefs to assist our determination. The New Jersey Education Association supports the Board's argument for immediate closure of the Charter School. The American Civil Liberties Union argues that we need not close the school at this time, but should reverse and remand the matter to the Commissioner for a careful consideration of the impermissible segregative effects the Charter School has had upon the district Middle School. The Excellent Education for Everyone supports the Charter School and urges affirmance of the State Board decision.
All parties agree that the Commissioner is required to monitor and remedy any segregative effect that a charter school has on the public school district in which the charter school operates. See N.J.S.A. 18A:36A-8(e)(mandating that charter schools "seek the enrollment of a cross section of the community's school age population including racial and academic factors"); N.J.S.A. 18A:36A-7 (forbidding charter schools from discriminating on any illegal basis in the admission process); N.J.S.A. 18A:36A-8(a) (requiring a "random selection process" [lottery] when there are more applicants than space); N.J.A.C. 6A:11-4.13 (mandating that charter schools "comply with all applicable laws and regulations governing equity in education," including federal and state civil rights laws); N.J.A.C. 6A:11-2.2(c) (requiring *371 the Commissioner annually to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence"); N.J.A.C. 6A:11-2.3(b)(7) (requiring the Commissioner to review, among other things, "[t]he annual assessments of student composition of the charter school"); In re Grant of the Charter Sch. Application of Englewood on the Palisades Charter Sch., 164 N.J. 316, 327-30, 753 A.2d 687 (2000) (confirming that the grant of a school charter may not violate statutory or constitutional guidelines assuring racial balance); In re Petition for Authorization to Conduct a Referendum on the Withdrawal of N. Haledon Sch. Dist. from the Passaic County Manchester Reg'l High Sch. Dist., 363 N.J.Super. 130, 143-44, 831 A.2d 555 (App.Div.) (reiterating the Commissioner's broad powers to remedy segregation in the context of a petition by a borough to withdraw from a regional high school district) certif. denied, 177 N.J. 573, 832 A.2d 323 (2003).
The Commissioner, therefore, "must consider the impact that the movement of pupils to a charter school would have on the district of residence" and "be prepared to act if the de facto effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence." Charter Sch. Application of Englewood on the Palisades, supra, 164 N.J. at 328, 753 A.2d 687. Accordingly, there is no question, and no party argues otherwise, that the Commissioner must ensure that the operation of a charter school does not result in district segregation. Id. at 330, 753 A.2d 687. The Commissioner must vigilantly seek to protect a district's racial/ethnic balance during the charter school's initial application, continued operation, and charter renewal application. See N.J.A.C. 6A:11-2.1(i) and 2.2(c).
Both parties acknowledge that the Red Bank district schools are racially imbalanced. The Board contends that the Charter School is exacerbating this imbalance. It argues that the school is "siphoning" non-minority pupils from the district and creating a "tipping point," that is, the "critical mass" of minority students that causes remaining non-minorities to leave the district. Expansion of the Charter School to four more grades will therefore, according to the Board, "further increase the exodus of whites from the district."
The Board also argues that of those students who left the Charter School and returned to the district, a disproportionate number were minorities, who then were disproportionately replaced by non-minorities. The Board pointed out that while the initial enrollment of non-minority students in the charter school in the year 2000 graduating class was 69% of all students, the percentage of non-minority students who ultimately comprised that year's graduating class was 88%. "The trend has been to trade African American for white." Expansion of the school "will certainly cause a further segregation of the Red Bank Public Schools."
In opposition, the Charter School argues that the Board has not established that the school's existence is worsening the existing imbalance. According to the Charter School, the data show that non-minority enrollment had been decreasing even before the school opened. There was a decline in non-minorities from 32% in 1995 to 25% in 1998, the year before the Charter School opened. Furthermore, from 1998-99, the first school year of the Charter School's operation, to 1999-00, the percentages of non-minorities decreased from kindergarten to first grade. This decline suggests "that the under-representation of white children in the District had its genesis *372 in the Primary School, which clearly cannot be related in any way with the Charter School," that for its first four years of operation only offered education for grades fourth through eighth. In addition, the Charter School asserts that a significant number of its students had not previously attended district schools. If the school were disbanded, these students, according to the Charter School, would not enter district schools, but would return to private schools, parochial schools, and home schooling.
The Charter School also argues that the Board had used the population of the borough as a whole to gather its racial/ethnic percentages, but the proper comparison should be the school-age population, which in 2000 was 38.1% white, 32.2% black, 27.1% Hispanic, and 2.6% Asian. In comparison to those figures, the Charter School's distribution for 2000-01 was 47.5% white, 33.8% black, 15% Hispanic, and 3.7% Asian/Pacific. Based on the January 2002 admission lottery, the expected Charter School enrollment for all nine grades for 2002-03 would be 47% white, 27% black, 24% Hispanic, and 2% Asian/Pacific. Thus, the charter school argues its student body has more minority students than non-minority students and had been and remains properly integrated.
Besides the Charter School submissions, the Commissioner also had the KPMG report, which found that the Charter School's "minority enrollment over the last four years ha[d] been reflective of the larger Red Bank community." The report also found that "[s]ince enrollment in the Red Bank Charter School is by random lottery and open to all Red Bank residents, all children have an equal opportunity" to attend the Charter School and that the 49% minority enrollment of the Charter School "clearly exceeds the demographics of the community."
The Department of Education had also analyzed the Charter School's enrollment for 2000-01. The Department found that of the eighty Charter School students, sixteen or 20% came from outside the district, and more than half of them came from private or parochial schools or from home schools. The report also noted the decline in enrollment in the primary and middle school from 1997-2000, was "not all due to the presence of the charter school.... The reasons for decline in enrollment may have more to do with parent dissatisfaction with the district." Further, the Department of Education noted that the percentage of non-minorities in the charter school had declined from 63.4% in 1999-2000 to 53.75% in 2000-01, while the percentage of minorities had increased from 34.2% to 46.25%.
We have previously determined that "in a charter-school-approval case [the Commissioner] is not acting in an adjudicatory capacity." In re Charter Sch. Appeal of the Greater Brunswick Charter Sch., 332 N.J.Super. 409, 415, 753 A.2d 1155 (App.Div.1999); In re Grant of the Charter Sch. Application of Englewood on the Palisades Charter Sch., 320 N.J.Super. 174, 235-36, 727 A.2d 15 (App.Div.1999), aff'd as modified, 164 N.J. 316, 753 A.2d 687 (2000). The major difference between the initial approval process and a renewal application is that much of the supposition and predictive fact that necessarily permeated the approval process is no longer necessary because the school's performance record is available for evaluation. Despite the availability of the performance record, however, we do not conclude that an adjudicatory hearing is required in every contested renewal-application-case.
The Legislature has delegated to the Commissioner authority to "develop procedures and guidelines for the revocation and renewal of a school's charter." *373 N.J.S.A. 18A:36A-17. We find no evidence in the adopted regulations or for that matter in the legislation or case law that requires the Department of Education to provide greater process for the renewal of a charter than that provided in its initial approval.
Neither the pertinent statutes nor regulations require a hearing as part of the initial application or renewal process. The district's role in the renewal decision is limited to filing its "recommendation" with the Commissioner. N.J.A.C. 6A:11-2.3(b)(8). Notably, a rule requires that the Commissioner state reasons only in the case of a denial: "The notification to a charter school that is not granted a renewal shall include reasons for the denial." N.J.A.C. 6A:11-2.3(c). Thus, when renewal is granted, the regulations do not require the Commissioner to explain the decision.
The Legislature did not intend to subject the renewal of a charter school to adjudicative proceedings accompanied by a full panoply of procedural protections. See Charter Sch. Application of Englewood on the Palisades, supra, 320 N.J.Super. at 235-36, 727 A.2d 15. The Commissioner, investigating a charter-school renewal application, is acting in his legislative capacity, not in a quasi-judicial capacity. See id. at 236, 727 A.2d 15. The Commissioner is merely applying his education expertise to the collected data, including the documents, statistics, site visit, and comprehensive review, to determine whether the charter should be renewed. See id. at 236, 727 A.2d 15. We see no reason to require the Commissioner to act in an adjudicative manner to review such applications. Thus, the renewal process does not "implicate the strictures of constitutional due process." See id. at 235, 727 A.2d 15. It remains essentially an investigatory proceeding without the need of adversarial procedural trappings. See ibid.
Therefore, we decline to require a full-blown hearing whenever a district board of education objects to the charter renewal of an existing school. Also, in view of the fact that the review in this case resulted in a renewal decision, we have no need to determine the procedural rights that a terminated charter school may hold.
Because the Commissioner, in rendering his renewal decision, was acting quasi-legislatively and not quasi-judicially, "he need not provide the kind of formalized findings and conclusions necessary in the traditional contested case." Charter Sch. Application of Englewood on the Palisades, supra, 320 N.J.Super. at 217, 727 A.2d 15. In reviewing quasi-legislative decisions, we do not seek to determine whether sufficient credible evidence is present in the record, but instead consider whether the decision is arbitrary, capricious or unreasonable. E. Windsor Reg'l Bd. of Educ. v. State Bd. of Educ., 172 N.J.Super. 547, 551-52, 412 A.2d 1320 (App.Div.1980). In addition, the reasons for the decision need not be detailed or formalized, but must be discernible from the record. Id. at 552-53, 412 A.2d 1320; In re Allegations of Physical Abuse at Blackacre Acad., 304 N.J.Super. 168, 188, 698 A.2d 1275 (App.Div.1997).
Here, the Commissioner did not specifically address the segregation argument in his letter approving the Charter School's renewal and expansion. But we can discern from the entire record, including the Board's stay application and the Commissioner's brief in this appeal, that the Commissioner concluded there was "no evidence in the record to suggest that the charter school has promoted racial segregation among the district's school-age children." The Commissioner further concluded "there is no requirement that the two *374 schools have exactly the same minority/non-minority enrollment figures." Instead, the Commissioner is to assess whether or not the charter school is seeking "a cross section of the community's school age population." N.J.S.A. 18A:36A-8(e). The State Board agreed with the Commissioner and found that the Red Bank Board's submissions had not demonstrated that the Charter School caused any segregation or that the proposed expansion would have any "impermissible impact on the racial composition of the district's schools."
Considering the record as a whole, we cannot say that either the State Board's or the Commissioner's decision was arbitrary, capricious, or unreasonable. N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-63, 384 A.2d 795 (1978). The record reveals that the local Board used the wrong population base and failed to establish causation by not discounting the pre-existing "white flight" trend in the district. Moreover, the Red Bank Board failed to object or raise any problems with any of the annual reports submitted by the Charter School, each of which detailed the "student admissions policy." Besides commenting favorably on the Charter School's minority enrollment over the last four years, the KPMG report also noted that the school had "successfully passed three annual reviews and site visits conducted by the NJ Department of Education." In addition, the report noted that enrollment by the Charter School was by "random lottery" and is open to all Red Bank residents. Therefore, "all children have an equal opportunity." The structured interview also yielded strong or adequate ratings for the Charter School's academic program, enrollment, facility plans, governance, faithfulness to the terms of the charter, fiscal solvency, school accountability, and operation within the applicable statutory and regulatory scheme. In short, the Charter School passed the comprehensive review and deserved to have its charter renewed. N.J.A.C. 6A:11-2.3(b).
Nevertheless, the enrollment statistics clearly demonstrate that the Charter School has a significantly higher percentage of non-minority students than the district schools, and the Board forcefully argues that the Commissioner's duty to remedy segregation "exists even if the public schools were segregated to begin with and even if a certain number of white students currently attending the charter school would choose instead to attend private or parochial schools should the Renewal Application be denied."
New Jersey abhors discrimination and segregation in our public schools. Charter Sch. Application of Englewood on the Palisades, supra, 164 N.J. at 324, 753 A.2d 687. Our policy prohibiting segregation is strong and rooted in our constitution. No person may be segregated or discriminated against in the public schools because of that person's "religious principles, race, color, ancestry or national origin." N.J. Const. art. 1, ¶ 5. "Whether due to an official action, or simply segregation in fact, our public policy applies with equal force against the continuation of segregation in our schools." Charter Sch. Application of Englewood on the Palisades, supra, 164 N.J. at 324, 753 A.2d 687. Therefore, the Commissioner must ensure "that no student is discriminated against or subjected to segregation in our public schools." Id. at 323, 753 A.2d 687.
But the remedy sought by the Red Bank Board in the context of the present appeal is to close a charter school that has otherwise been judged successful. No one claims that the Charter School is not recruiting from a racial cross-section of the school age population, N.J.S.A. 18A:36A-8(e), and applying a random lottery in its *375 enrollment process. N.J.S.A. 18A:36A-8(a). Every student in Red Bank who is age appropriate is eligible for enrollment.
The Charter School should not be faulted for developing an attractive educational program. Assuming the school's enrollment practices remain color blind, random, and open to all students in the community, the parents of age eligible students will decide whether or not to attempt to enroll their child in the Charter School and any racial/ethnic imbalance cannot be attributed solely to the school. To close this school would undermine the Legislature's policy of "promoting comprehensive educational reform" by fostering the development of charter schools. N.J.S.A. 18A:36A-2.
The right to bring a separate action, under the Commissioner's general adjudicatory powers, N.J.S.A. 18A:6-9, to address the district's racial/ethnic imbalance is of course available in this instance. However, the Board claims the Charter School's actions after utilizing the impartial lottery to select students, exacerbates the existing racial/ethnic imbalance. What is specifically argued is that the school's population "becomes whiter as it progresses towards graduation."
The Board challenges the veracity of the Charter School's explanation that minorities leave the school to relocate in other districts or because of "disagreement with the structure and rigor of [the Charter School's] expectations." The Board charges that the Charter School frequently returns "to the Red Bank Middle School minority students with poor academic records immediately prior to statewide standardized testing." The Red Bank Superintendent of Schools by affidavit swore that he had "witnessed children who, immediately prior to statewide testing ... are returned to the Middle School purportedly because of `academic and behavioral difficulties.'" This had occurred, according to the Superintendent, "substantially more than once or twice." The Superintendent swore that the "overwhelming majority of the students [returned] are African American and Hispanic." The Board contended that of "twenty-four Non-white students who left the [Charter School], all but three returned to the Red Bank Middle School." While the Charter School calls this charge "outrageous," the Board claims that parents and guardians of nine former Charter School minority students are prepared to testify about being "requested" to withdraw from the Charter School.
In addition, the Board charges that the waiting list and the sibling preference policy are being utilized in a manner to further exacerbate racial/ethnic imbalance. The Superintendent swore that "the percentage of children that drop out of the Charter School prior to graduation and come to the Middle School is overwhelmingly minority and the percentage of graduates of the Charter School are overwhelmingly white." The Superintendent charged also that "the sibling policy not only fosters the percentage of white children attending the Charter School but removes those places from the lottery for which non-white, i.e, African American and Hispanic children would otherwise be candidates."
We find these allegations of the school's enrollment and withdrawal policies disturbing and difficult to dismiss on this record. While the Charter School's enrollment practices might not be the sole cause of existing racial/ethnic imbalance, the manner of operation of the school after its color-blind lottery, warrants closer scrutiny to determine whether some of the school's practices may be worsening the existing racial/ethnic imbalance in the district schools.
*376 Classification of a proceeding as non-judicial or legislative and therefore undeserving of a hearing, often begs the question. Cunningham v. Dept. of Civil Serv., 69 N.J. 13, 19, 350 A.2d 58 (1975). "[I]t is inappropriate to decide whether a party has a right to a hearing solely on the basis of a label attached to the matter at issue." Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 351, 426 A.2d 1000, appeal dismissed, 454 U.S. 804, 102 S.Ct. 77, 70 L. Ed.2d 74 (1981). The Charter School vigorously disputed the exacerbation charges, but the record does not contain the specific arguments or data that may have been made available to the Commissioner to counter the Board's charges. If these charges are true, the school's practices would be "discordant with the State's policy of maintaining nonsegregated public schools in our communities." Charter Sch. Application of Englewood on the Palisades, supra, 164 N.J. at 327, 753 A.2d 687. The State Board recognized the gravity of the segregation charges, but merely emphasized "the importance of the Commissioner's continuing responsibility to assess on an annual basis the student composition of the Charter School and the segregative effect that the loss of the students may have on the Red Bank School District."
In our opinion, relegating these charges to the annual review is insufficient to protect this State's important anti-segregation policies. While we have struggled to maintain non-segregated schools, our efforts have met with less than universal success. According to the report of the Civil Rights Project at Harvard University, African-American and Hispanic students in New Jersey attend schools that are among the most segregated in the nation. Erica Frankenberg et al., A Multiracial Society with Segregated Schools: Are we Losing the Dream?, (Jan. 16, 2003), at http://www.civilrightsproject. Harvard.edu/research/reseg03/reseg03 full.php. In only five states does the average African-American student attend school with fewer non-minority students than does the average New Jersey African American student. We must do better. Our Supreme Court has "exhorted the Commissioner to exercise broadly his statutory powers when confronting segregation, whatever the cause." Charter Sch. Application of Englewood on the Palisades, supra, 164 N.J. at 324, 753 A.2d 687. The Commissioner, while approving the charter renewal, should have severed the disputed exacerbation issues for further evaluation in a hearing. See In re Wiggins, 242 N.J.Super. 342, 345, 576 A.2d 932 (App.Div.1990).
We further note that the Charter School's 2000-01 annual report listed the "Admissions Priority Policy" as "following any lottery for the enrollment of students, priority enrollment shall be given, first, to the sibling of any Charter School student then enrolled who is a resident in the Red Bank Charter School District; second, to any student who is a resident in the Red Bank Charter School District ..."
The relevant statute provides that "[p]reference for enrollment in a charter school shall be given to students who reside in the school district in which the charter school is located." N.J.S.A. 18A:36A-8(a). The statute further provides that "[a] charter school may give enrollment priority to a sibling of a student enrolled in the charter school." N.J.S.A. 18A:36A-8(c). Thus, preference "shall" be given to residents, but "may" be given to siblings. N.J.S.A. 18A:36A-8(a), (c). The statutory sibling preference is not mandatory and in particular circumstances, might not be appropriate, especially if its operation exacerbates existing racial/ethnic imbalance.
*377 Accordingly, we remand to the State Board for the Commissioner to conduct an appropriate hearing to determine whether any aspect of the Charter School's operation of the lottery, waiting list, sibling preference, and student withdrawal practices, together with any other actions following enrollment, exacerbate the district's racial/ethnic imbalance. Upon completion of the hearing, the Commissioner shall determine whether any remedial action is warranted, including whether to develop a remedial plan for the Charter School. N.J.S.A. 18A:36A-17.

III.
The Board also contends that the State Board erred by granting the renewal without adequately considering the detrimental impact on the Board's ability to provide a thorough and efficient (T & E) education. N.J. Const. art. VIII, § 4, ¶ 1. In support of its T & E argument, the Board claimed that the funding of the Charter School would cause the district's budget to be reduced by $720,000 and that would cause the elimination of four teaching positions, requiring bigger classes. The district would also be forced to eliminate courtesy busing and reduce hall monitors, some instructional assistants, and cafeteria monitors.
We cannot fault the State Board for rejecting this argument. To warrant serious consideration of such an argument, it is incumbent upon the district board to demonstrate specifically how the board would be precluded from providing T & E. As in the initial approval process, "the district must be able to support its assertions" with some specificity. Charter Sch. Application of Englewood on the Palisades, supra, 164 N.J. at 334, 336, 753 A.2d 687 (2000). "[U]nsubstantiated, generalized protests" are as insufficient to prevent renewal, as they were to prevent the initial approval. Id. at 336, 753 A.2d 687. Renewal of a successful charter school will be favored, "unless reliable information is put forward to demonstrate that a constitutional violation may occur." See ibid.
Significant by their absence in the Board's argument is reference to the regulations that the State Board has promulgated to measure T & E: N.J.A.C. 6:8-1.1 to 4.2. A reduction in force would be expected given that there will be fewer students to educate by the Board after they move to the expanded charter school. While "courtesy busing" might be important for Red Bank, it is not mandated or necessary for T & E. Similarly, the Board has not specifically demonstrated how the elimination of monitors and other assistants would impair its T & E efforts. The paucity of specificity in the Board's charges is fatal.

IV.
The Board also seeks reversal of the renewal and expansion decision because the Charter School failed to supply three items of information that were indispensable to a proper assessment of the renewal application. All of the claimed omissions are inconsequential.
First, the Board claimed the Charter School provided no curriculum information in its renewal application. The renewal process, however, does not require any curriculum submissions or evaluation. N.J.A.C. 6A:11-2.3. That is so because the Commissioner is obligated to review the school's annual reports, N.J.A.C. 6A:11-2.3(b)(2), which must describe how the school's curriculum satisfies the New Jersey Core Curriculum Content Standards. N.J.A.C. 6A:11-2.2(a)iii.
In any event, the Charter School included four pages devoted to curriculum in its *378 renewal application and also detailed the proposed curriculum for the new K-3 grades in its supplemental submission. The Board offers no authority that anything more was required.
Second, the Board complains that the charter school failed to provide it with a "racial breakdown of the students on the `waiting list.'" N.J.A.C. 6A:11-4.5 does not demand that the waiting list classify students by race, and there appears to be no provision for "discovery" by the district board in the renewal process. Nevertheless, we note from the annual reports that the waiting lists contain substantial numbers of students, and in view of the remand we have directed, we anticipate that the racial/ethnic breakdown of the list and its utilization will be among the facts necessary to be developed during the hearing.
Third, the Board complains that the Charter School "failed to provide any information with respect to the racial breakdown of the January 14, 2002, lottery, but instead, offered vague and general assurances that the school would be racially balanced." Nothing in the pertinent statute or regulations requires such a breakdown during the renewal process. But in any event, the February 2002 supplemental material set forth the expected racial distribution for the whole Charter School for 2002-03.
For the assistance of the parties on the remand, we also note that substantial discrepancies appear among the various statistics that the Board, Charter School, KPMG, and the Department utilized. For example, in the Supplemental Certification by the Charter School Board of Trustees' President, he certified that the 2000-01 composition of the Charter School was 47.5% non-minority. Yet, the Charter School Renewal Application reported the "Ethnic Makeup" of the class of 2000-01 as 51% non-minority. At the hearing on remand, we urge the parties to stipulate to as many of the relevant statistics as possible.

V.
The Board also finds fault with the process utilized by the Commissioner and makes the following four arguments: (1) the Commissioner unfairly refused to permit a response to the December 6, 2001, supplemental submissions of the charter school; (2) the Commissioner considered an ex parte communication in the form of the Charter School's November 27, 2002, letter to contest factual inaccuracies in the Board's initial response to the renewal application; (3) the Charter School "met privately" with the Department of Education staff at the November 29, 2001, "structured interview;" and (4) neither the Commissioner nor the State Board made the requisite findings of fact and conclusions of law in disposing of the Board's objections.
All of the process arguments would have greater currency if we were reviewing a "contested case" under the Administrative Procedure Act. N.J.S.A. 52:14B-2(b). But, we are not. As we have previously indicated, a hearing on the charter renewal was not required. As we have also indicated, however, the Commissioner is not precluded from scheduling a hearing when, in his judgment, any of the issues raised may warrant exploration in a more formalized setting, as in our opinion, should have been done with respect to the segregation issue in this case.
We further note that the Board has not specified how it was prejudiced by the several procedural defects it alleges. It does not identify what was inaccurate or misstated in the Charter School submissions, and does not establish that the Commissioner's renewal decision likely would have been different had the Board been *379 allowed to respond to the additional submissions, the "ex parte communication" or to have been present at the "private" meetings.
The "structured interview" is authorized by N.J.A.C. 6A:11-2.3(b)(9), and is conducted by the "Commissioner or designee(s)" with various members and representatives from the Charter School. Id. at 2.3(b)(9)(i)-(iv). No member of the district board of education need be consulted during the structured interview, and "private meetings," which exclude district representatives, are therefore permissible.

VI.
Accordingly, we affirm the State Board's decision renewing and expanding the Red Bank Charter School. We remand to the State Board so the Commissioner may conduct a hearing to determine whether the lottery, waiting list, sibling preference and withdrawal policy, and any other practices of the Charter School are adversely impacting the Red Bank district's racial/ethnic imbalance. After concluding the hearing, if the Commissioner finds merit in the local Board's claims, he shall develop an appropriate remedy, which properly balances our strong policy in favor of non-segregated schools with our policy of fostering the development of effective charter schools.
Affirmed in part and remanded in part for further proceedings consistent with this decision. We do not retain jurisdiction.