**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2828-19

IN RE AMENDMENT
APPLICATION TO
EXPAND ENROLLMENT
OF PACE CHARTER
SCHOOL OF HAMILTON.

_____

Argued December 15, 2021 – Decided February 24, 2022

Before Hoffman, Geiger and Susswein.

On appeal from the New Jersey Department of Education.

Casey P. Acker argued the cause for appellant Hamilton Township Board of Education (Lenox, Socey, Formidoni, Giordano, Lang, Carrigg & Casey, LLC, attorneys; Patrick F. Carrigg, of counsel; Casey P. Acker, on the briefs).

Thomas O. Johnston argued the cause for respondent Pace Charter School of Hamilton (Johnston Law Firm, LLC, attorneys; Thomas O. Johnston, on the brief).

Laurie Fichera, Deputy Attorney General, argued the cause for respondent New Jersey Commissioner of Education (Andrew J. Bruck, Acting Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Laurie Fichera, on the brief).

PER CURIAM

The Hamilton Township Board of Education (Hamilton) appeals from a decision of the Commissioner of Education (Commissioner), granting Pace Charter School's (Pace) application to amend its charter to increase enrollment from 405 to 450 students. Hamilton opposed the amendment, claiming that the increased enrollment would "siphon[] Hispanic students to a lopsided degree" and thus will have a segregative impact. After carefully reviewing the record in light of the governing principles of law, we affirm the Commissioner's decision.

I.

Pace began operating in Hamilton Township in 1999. The school's enrollment was capped at 405 students, as of 2018. Because the demand to attend Pace was high, the school implemented a random lottery system for admission. As of November 2019, 590 applicants were on a waitlist. On November 26, 2019, Pace submitted a request to the Commissioner pursuant to N.J.A.C. 6A:11-2.6 to amend its charter and increase student enrollment by forty-five students. Under the proposed expansion, during the 2020-2021 school

year, Pace would add twenty-seven students. Nine students would be added in each of the following two years.[1]

As part of its application, Pace submitted evidence pertaining to the school's level of academic performance, fiscal stability, and ability to maintain its operational capabilities should the expansion request be granted. The record also shows that Pace recruited students from throughout the surrounding community by means of advertising and by distributing applications for enrollment to the public. The school reached out to the parents of children attending local preschool programs. The school also relied on a local newspaper, Facebook, school newsletters, and Pace's website. Applications for enrollment were available in multiple languages, and the school's website could be translated into other languages. The website made clear that the school has an admission policy of nondiscrimination.

On January 23, 2020, Hamilton submitted a letter to the Commissioner opposing the expansion. Hamilton requested the Commissioner to deny the application or in the alternative to stay the decision pending "a full assessment

---

[1] The request for expansion also noted that Pace desired to acquire an additional property. The expansion application explained, "[a]dding this facility would give Pace Charter School the opportunity to downsize to two campus locations and would provide upgrades to . . . current facilities."

3

of the causes of de facto segregation persistent in Pace's enrollment." Hamilton claimed in the opposition letter that "Pace's enrollment of Hispanic students is grossly disproportionate to the total population of Hispanic persons living in Hamilton Township" and that the school had "siphoned Hispanic students to a lopsided degree." In support of its opposition, Hamilton attached an excerpt of the minutes of the January 22, 2020 Hamilton Board of Education meeting at which the Board adopted a resolution requesting the Department to conduct a "full, open and thorough analysis" of Pace's alleged disparate enrollment demographics. Hamilton also attached "government demographic data" consisting of census and demographic data regarding the population of Hamilton Township.

On February 3, 2020, the Commissioner granted Pace's request for expansion of its charter. In rendering the decision, the Commissioner explained:

> The Department has evaluated this request by reviewing Pace Charter School's academic, operational, and fiscal standing based on the criteria outlined in the Office of Charter and Renaissance Schools' Performance Framework [(Performance Framework)]. The Department's evaluation also included a review of any public comment received in accordance with N.J.A.C. 6A:11-2.6(c), demand for an increase in the school's enrollment, segregative effect in accordance with N.J.A.C. 6A:11-2.2(c) and consideration of the fiscal impact of the expansion on the district of

residence.  Based on the review outlined below, I am granting Pace Charter School's amendment request.

Regarding academic performance, the Commissioner determined that "[b]ased on preliminary 2018-2019 statewide assessment results, Pace Charter School appears to continue the academic trends in the 2016-2017 and 2017-2018 school year.  The Department believes Pace Charter School continues to be a high performing charter school academically."

As to fiscal stability, the Commissioner determined that Pace was fiscally sound.  This determination was based on the Performance Framework and the fiscal impact of the expansion on sending districts.

The Commissioner also considered the charter school's organizational performance.  The Commissioner determined that Pace's amendment request adequately described the performance management and strategic plans for expansion. The Commissioner found that the school's operation for over twenty years "demonstrated faithfulness to its mission and the implementation of key design elements."

Finally, the Commissioner acknowledged public demand for enrollment and public comment.  Specifically, the Commissioner noted the large waitlist for admission to Pace.  The Commissioner also expressly recognized that

Hamilton had submitted an opposition letter articulating concerns about "de facto segregation in Pace's . . . enrollment."

Hamilton filed a Notice of Appeal after the Commissioner granted Pace's request.[2]  Hamilton raises the following contentions for our consideration:

POINT I

THE COMMISSIONER'S GRANTING OF THE AMENDMENT WAS ARBITRARY, CAPRICIOUS AND UNREASONABLE BECAUSE THE COMMISSIONER FAILED TO CONSIDER THE SEGREGATIVE EFFECT OF PACE'S ENROLLMENT PRACTICES.

POINT II

THE COMMISSIONER'S GRANTING OF THE AMENDMENT WAS ARBITRARY, CAPRICIOUS AND UNREASONABLE BECAUSE IT FAILED TO ASSESS PACE'S STUDENT COMPOSITION AND THE SEGREGATIVE EFFECT THAT THE LOSS OF THE STUDENTS HAS ON THE DISTRICT OF RESIDENCE AS REQUIRED BY LAW.

POINT III

THE COMMISSIONER'S GRANTING OF THE AMENDMENT WAS ARBITRARY, CAPRICIOUS AND UNREASONABLE BECAUSE IT VIOLATES THE EXPRESS LEGISLATIVE POLICY OF DESEGREGATION OF NEW JERSEY'S PUBLIC SCHOOLS.

---

[2]  On March 28, 2020, Hamilton filed an Amended Notice of Appeal.  On April 10, 2020, Hamilton filed a second Amended Notice of Appeal.

A-2828-19

II.

We begin our analysis by acknowledging the foundational legal principles governing this appeal. The scope of our review of an agency decision is narrow. Reviewing courts "may reverse an agency decision if it is arbitrary, capricious, or unreasonable." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013) (citing In re Petitions for Rulemaking, 117 N.J. 311, 325 (1989)). A reviewing court can only intervene "when 'it is clear that the agency action is inconsistent with its mandate.'" Ibid. As the New Jersey Supreme Court has stated on many occasions,

> [a]lthough sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role [in reviewing an agency action] is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385–86 (alteration in original) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Furthermore, appellate courts must give deference to the Commissioner's findings given his or her expertise in the educational field. See id. at 389.

A-2828-19

Importantly for purposes of this appeal, the Commissioner's review of charter school renewal and amendment applications is deemed to be a quasi-legislative function. As our Supreme Court recently re-affirmed, accordingly, the Commissioner is not required "to provide 'the kind of formalized findings and conclusions necessary in the traditional contested case." In re Renewal Application of Team Acad. Charter Sch., 247 N.J. 46, 74 (2021) (citing In re Team Acad. Charter Sch., 459 N.J. Super. 111, 140 (App. Div. 2019) (quoting In re Englewood on the Palisades Charter Sch., 320 N.J. Super 174, 217 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000)). The Court explained, "[f]or 'more policy-driven, quasi-legislative acts' such as those at issue here, 'the record may be less extensive' than the record of a contested case . . . . The basis for the determination, however, 'must be discernible from the record' considered by the agency." Id. at 74–75. The Court added, an "appellate court's determination [of] whether the record contains 'substantial evidence to support the findings on which the agency based its action' requires 'a sifting of the record, and the ability to find support for the conclusions reached by the Commissioner under the statutory framework within which she [or he] must act.'" Id. at 75; see also In re Red Bank Charter Sch., 367 N.J. Super. 462, 476 (App. Div. 2004).

Our Supreme Court in Englewood provided general guidance on how the Commissioner is to assess the racial impact a charter school would have on the district in which the charter school operates. Englewood, 164 N.J. at 329. The Court explained,

> We express no view on the formality or structure of that analysis except to state that it must take place before final approval is granted to a charter school applicant. We otherwise leave the form and structure of that analysis to the Commissioner and State Board to determine. We simply hold that the Commissioner's obligation to prevent segregation in the public schools must inform his [or her] review of an application to approve a charter school, and if segregation would occur the Commissioner must use the full panoply of his [or her] powers to avoid that result.
>
> [Ibid.]

### III.

We first address Hamilton's argument that the Commissioner's decision was arbitrary and capricious because it failed to consider the segregative effect of Pace's enrollment practices. The record shows to the contrary that the Commissioner considered Hamilton's opposition and determined that Pace's enrollment practices are not segregative.

The applicable regulations make clear that a charter school can apply for an amendment to its charter following the final granting of the charter for

reasons such as expanding enrollment. N.J.A.C. 6A:11-2.6(a)(1)(i). When reviewing an amendment application, the Commissioner "shall determine whether the amendments are eligible for approval and shall evaluate the amendments based on [the Charter School Program Act of 1995 (CSPA)] . . . and shall review a charter school's performance data in assessing the need for a possible charter amendment." N.J.A.C. 6A:11-2.6(b). Under this regulatory framework, the Commissioner is expressly obligated to "monitor and remedy any segregative effect that a charter school has on the public school district in which the charter school operates." Red Bank, 367 N.J. Super. at 471 (citing N.J.S.A. 18A:36A-8(e)). Therefore, "[t]he Commissioner . . . 'must consider the impact that the movement of pupils to a charter school would have on the district of residence' and must 'be prepared to act if the de facto effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence.'" Id. at 472 (quoting Englewood, 164 N.J. at 328); see also N.J.A.C. 6A:11-2.1(j) ("Prior to the granting of the charter, the Commissioner shall assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence.").

In evaluating segregative effects, the Commissioner must consider the charter school's enrollment practices. Pursuant to N.J.S.A. 18A:36A-8, proper

enrollment practices include: (1) giving preference to those who live in the school district where the charter school is located, (2) a random selection process when the applications for enrollment exceed the available spaces, and (3) having an admissions policy that "seek[s] the enrollment of a cross section of the community's school age population including racial and academic factors."

In view of this statutory and regulatory framework, we are satisfied that the Commissioner's decision in this case was not arbitrary or capricious. Hamilton argues that the Commissioner's statement that he considered the segregative effect of increased enrollment pursuant to N.J.A.C. 6A:11-2.2(c), did not provide enough evidence that he actually examined Pace's enrollment practices. Hamilton's contention fails to recognize that because the Commissioner is exercising a quasi-legislative function, he is not required to explain in detail his examination of potential segregative effects. See Englewood, 164 N.J. at 329. Rather, a reviewing court simply needs to determine, after "a sifting of the record," Team Acad., 247 N.J. at 75, whether the Commissioner's reasons for his conclusion are discernible, Red Bank, 367 N.J. Super. at 476.

Our review of the record shows adequate support for the Commissioner's conclusion that Pace's enrollment practices are not segregative. First, the record

shows that Hamilton's Hispanic public-school population increased between 2015 and 2018. We deem that fact to be significant, contradicting Hamilton's claim that Pace's enrollment practices have had a segregative effect, "siphon[ing] Hispanic students to a lopsided degree." Additionally, Hamilton fails to acknowledge that the majority of students attending Pace are actually residents of Trenton, not Hamilton Township.

It bears emphasis that Hamilton's argument fails to identify any segregative enrollment practice. Our decision in Red Bank is instructive on this point. In that case, the Red Bank Board of Education (RBB) opposed the renewal and expansion of the Red Bank Charter School. 367 N.J. Super. at 469. In support of its argument that the charter school's enrollment practices had a segregative effect, the RBB pointed to the random lottery system used for all Red Bank residents, the waiting list, a sibling preference policy, and student withdrawal policy as contributing to segregation in Red Bank. Id. at 479–80. Regarding the withdrawal policy, the RBB argued that students were returned to the Red Bank public school system right before statewide testing and that the overwhelming majority of those students were African American and Hispanic. Id. at 479. The RBB claimed that "the percentage of children that drop out of the Charter School prior to graduation and come to the Middle School is

12

overwhelmingly minority and the percentage of graduates of the Charter School are overwhelmingly white." Id. at 479.

The RBB also claimed that the charter school's sibling preference policy allowed siblings of enrolled students to avoid the lottery system. RBB argued that "the sibling policy not only fosters the percentage of white children attending the Charter School but removes those places from the lottery for which non-white, i.e, African American and Hispanic children would otherwise be candidates." Id. at 479–80.

Ultimately, we determined that "allegations of the school's enrollment and withdrawal policies [were] disturbing and difficult to dismiss on this record." Id. at 480. As a result, we remanded the matter for the Commissioner to conduct "a hearing to determine whether the lottery, waiting list, sibling preference and withdrawal policy, and any other practices of the Charter School [were] adversely impacting the Red Bank district's racial/ethnic imbalance." Id. at 486. We nonetheless affirmed the renewal and expansion of the charter school. Ibid.

In contrast to the situation in Red Bank, nothing in the record before us (aside from a bald assertion) supports Hamilton's claim that Pace's enrollment practices are segregative in nature. As previously noted, the record shows that Pace recruited students throughout the surrounding community via advertising

and by distributing applications to the public, including local preschool programs, the local newspaper, Pace's Facebook page and school newsletter, and Pace's website. Further, the record shows that enrollment applications are available in multiple languages, and that Pace's website can be translated into other languages. The record before us also does not suggest that Pace has a sibling preference policy. Nor does the record show a high withdrawal rate of students. On the contrary, the record shows that few, if any students, have withdrawn from the charter school.

Hamilton also fails to explain how the random lottery system Pace employs could contribute to segregation in Hamilton Township. As we noted in Red Bank, "[a]ssuming the school's enrollment practices remain color blind, random, and open to all students in the community, the parents of age eligible students will decide whether or not to attempt to enroll their child in the Charter School and any racial/ethnic imbalance cannot be attributed solely to the school." Id. at 478. Charter schools "should not be faulted for developing an attractive educational program" so long as the "school's enrollment practices remain color blind, random, and open to all students in the community . . . ." Ibid.

In Red Bank, we concluded that

> the Commissioner did not specifically address the segregation argument in his letter approving the Charter School's renewal and expansion. But we can discern from the entire record, including the Board's stay application and the Commissioner's brief in this appeal, that the Commissioner concluded there was "no evidence in the record to suggest that the charter school has promoted racial segregation among the district's school-age children.").
>
> [Id. at 476.]

In the matter before us, the Commissioner did address Hamilton's segregation argument in his approval letter, albeit in a conclusory fashion. We are satisfied that the basis for the Commissioner's determination is discernible from the record before us.

IV.

We next address Hamilton's closely-related contention that the Commissioner failed to consider the loss of students on the district of residence. That assertion is belied by the record.

As we have noted, the Commissioner is obligated to "monitor and remedy any segregative effect that a charter school has on the public school district in which the charter school operates." Id. at 471 (citing N.J.S.A. 18A:36A-8(e)). Therefore, "[t]he Commissioner . . . 'must consider the impact that the movement of pupils to a charter school would have on the district of residence' and 'be

15

prepared to act if the de facto effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence.'" Id. at 472 (quoting Englewood, 164 N.J. at 328); see also N.J.A.C. 6A:11-2.1(j) ("Prior to the granting of the charter, the Commissioner shall assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence.").

Here, the record shows that the Commissioner considered Pace's student composition and the segregative effect that the loss of students would have on Hamilton. First, the Commissioner reviewed Pace's performance framework that spanned 2015 to 2018. The available data shows that the majority of students enrolled at Pace reside in Trenton, not Hamilton Township, and that the second largest population of students at Pace are Hispanic. Although Hamilton acknowledges in this appeal that Pace has a large population of Hispanic students, it does not acknowledge in its briefs that the majority of students enrolled at Pace reside in Trenton.

Hamilton also fails to acknowledge statistics in its own performance report that contradict one of the key reasons for its opposition. That report shows that the number of Hispanic students enrolled in the Hamilton public school system actually increased over the relevant three-year period.

Furthermore, the statistics in its own report show that the Hispanic student population in the Hamilton public school system was the only "racial and ethnic group" that experienced an increase in enrollment over those three years. From this, we discern from the record that Hamilton is not experiencing a segregative effect from Pace's operation.

V.

Finally, we address Hamilton's more generalized contention that the Commissioner's decision violates New Jersey's legislative policy of desegregation. The Supreme Court in Englewood aptly recognized that

> The history and vigor of our State's policy in favor of a thorough and efficient public school system are matched in its policy against racial discrimination and segregation in the public schools. Since 1881 there has been explicit legislation declaring it unlawful to exclude a child from any public school because of his [or her] race (L. 1881, c. 149; N.J.S.A. 18A:38–5.1), and indirect as well as direct efforts to circumvent the legislation have been stricken judicially. In 1947, the delegates to the Constitutional Convention took pains to provide, not only in general terms that no person shall be denied any civil right, but also in specific terms that no person shall be segregated in the public schools because of his [or her] "religious principles, race, color, ancestry or national origin." Art. 1, para. 5.
>
> [164 N.J. at 324 (quoting Jenkins v. Twp. of Morris Sch. Dist. and Bd. of Educ., 58 N.J. 483, 495–96 (1971)).]

17

Further, the Court noted that "New Jersey's abhorrence of discrimination and segregation in the public schools is not tempered by the cause of the segregation. Whether due to an official action, or simply segregation in fact, our public policy applies with equal force against the continuation of segregation in our schools." Ibid. (citing Booker v. Bd. of Educ., Plainfield, 45 N.J. 161 (1965)).

Our State's stalwart policy of desegregation applies to charter schools no less than public schools. Pursuant to N.J.S.A. 18A:36A-7, charter schools

> shall be open to all students on a space available basis and shall not discriminate in its admission policies or practices on the basis of intellectual or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language, or any other basis that would be illegal if used by a school district; however, a charter school may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.

Furthermore, as we have already noted, "the Commissioner shall assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence" on an annual basis. N.J.A.C. 6A:11-2.2(c).

At bottom, the Commissioner, no less than a local board of education, has a core responsibility to guard against segregated schools. In Englewood, the

Court stressed that the Commissioner must "use the full panoply of his [or her] powers to avoid that result." 164 N.J. at 329. Hamilton has failed to show that the Commissioner has in any way abdicated his responsibility to detect, prevent, and remediate such discrimination. To the contrary, we are satisfied the Commissioner fulfilled his obligation and did not act arbitrarily, capriciously, or unreasonably either in granting the application for expansion or in explaining the reasons for that decision. See Team Acad., 247 N.J. at 75 (noting that "the basis for the determination . . . 'must be discernible from the record' considered by the agency").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION