**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3074-16T4

IN THE MATTER OF THE APPROVAL
OF THE CHARTER AMENDMENT OF
CENTRAL JERSEY COLLEGE PREP

_____

Argued May 30, 2019 – Decided June 7, 2019

Before Judges Haas, Sumners and Mitterhoff.

On appeal from the New Jersey Department of Education.

William C. Morlok argued the cause for appellant Franklin Township School District (Parker McCay, PA, attorneys; Brett E.J. Gorman, of counsel and on the briefs; Kayleen Egan, on the briefs).

Brenda C. Liss argued the cause for respondent Central Jersey College Prep Charter School (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Brenda C. Liss, of counsel and on the brief; Stephen M. Turner, on the brief).

Geoffrey N. Stark, Deputy Attorney General, argued the cause for respondent Department of Education (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; James M. Esposito, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Franklin Township Board of Education (Franklin) appeals from the February 28, 2017 final decision of the Commissioner of Education (Commissioner), approving an application by Central Jersey College Prep Charter School (CJCP) to amend its charter to increase enrollment, add a satellite campus, and move its main campus to a new facility.[1] We affirm.

I.

We begin by reciting the essential background facts and procedural history of this matter. CJCP is a charter school located in Franklin Township, Somerset County, with an approved "region of residence,"[2] that includes Franklin

_____

[1] Calendared back-to-back with this appeal, North Brunswick Township Board of Education (North Brunswick), New Brunswick Board of Education (New Brunswick) and Piscataway Township Board of Education (Piscataway) separately appealed from this same decision. North Brunswick Twp. Bd. of Educ. v. Harrington (North Brunswick), No. A-3415-16. Two other appeals from decisions by the Commissioner regarding charter schools are also calendared back-to-back with this case. Highland Park Bd. of Educ. v. Harrington (Highland Park II), No. A-3455-16; Bd. of Educ. of the Twp. of Piscataway v. N.J. Dep't of Educ. (Piscataway), No. A-5427-16. Because of this overlap, the reader is encouraged to review all four of our opinions in these cases, which are being released simultaneously.

[2] The term "region of residence" is defined as "contiguous school districts in which a charter school operates and is the charter school's district of residence." N.J.A.C. 6A:11-1.2.

Township, New Brunswick, and North Brunswick. The school began operation in 2006. It was approved under the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18 (the Charter School Act or CSPA), to serve students in grades kindergarten through eighth, with a maximum enrollment of forty-eight students per grade, and a projected total enrollment of 624 students for the 2019-2020 school year. Its mission is "to prepare its students for post-secondary education and beyond with the necessary skills and knowledge they need to intellectually and emotionally reach their maximum potential."

CJCP is a high-performing, Tier 1 school, a ranking it received from the New Jersey Department of Education's (Department or NJDOE) assessment of its academic performance based on the metrics set forth in the State's Academic Performance Framework governing charter schools.[3] It was awarded the National Blue Ribbon Award in 2016, named a High Performing Title I Reward School in 2015, featured as a Top Performing High School in U.S. News and World Report in 2015 and 2016, and designated as a "Top Ten Middle School" by JerseyCAN in 2013.

---

[3] The "Performance Framework" as referenced in N.J.A.C. 6A:11-2.3(b)(2), and as defined in N.J.A.C. 6A:11-1.2, sets specific quantitative and qualitative standards for academic, financial, and organizational performance.

Appellant Franklin Township Board of Education (Franklin) operates the traditional Franklin Township Public Schools (FTPS). For the 2016-2017 school year, approximately 7000 students from Franklin Township were enrolled in FTPS. Two charter schools also operate within the district, CJCP and Thomas Edison EnergySmart Charter School (TEECS). A third school, Ailanthus Charter School, received approval to begin operation for the 2018-2019 school year. In re Ailanthus Charter Sch., No. A-0945-16 (App. Div. May 11, 2018). As of April 2017, 330 students from Franklin were enrolled in CJCP, 311 students were enrolled in TEECS, and forty-eight students were enrolled in out-of-district charter schools (Hatikvah International Charter School (Hatikvah) and the Greater Brunswick Charter School).

On December 1, 2016, CJCP submitted a charter amendment application seeking to: 1) expand its maximum enrollment from 624 to 1320 students by the 2019-2020 school year; 2) add a satellite campus in New Brunswick (within its region of residence) by the 2019-2020 school year; and 3) relocate the current facility to a new facility on Mettlers Road in Somerset. It proposed to enroll 960 students at the Somerset campus and 360 students at the New Brunswick campus. In accord with N.J.A.C. 6A:11-2.6(a)(2), CJCP submitted a board resolution authorizing the request to amend, a copy of the proposed revisions to

4

the charter, and a rationale statement in support of the proposed amendment.

CJCP stated that its need for expansion was "driven primarily by the heavy demand from the community to be a part of the educational success that it had instilled." It represented that the number of applications had dramatically increased over the past few years, totaling 465 for the 2014-2015 school year, and 956 for the 2016-2017 school year. CJCP had, at the time of the application, 628 students on its waiting list and was only able to accept approximately 25% of the application pool. Thus, it maintained that under the current maximum capacity of forty-eight students per grade, it was "unable to service the vast number of students who would benefit" from the education provided by the school.

CJCP anticipated that demand for admission would continue to increase as a result of its awards, expansion, and proposed new facilities. It submitted student achievement results showing that in the spring of 2016, its students had significantly outperformed their peers attending FTPS in all PARCC assessments. For the 2016-2017 school year: 65% of their high school students were enrolled in at least one Advanced Placement (AP) class; 84% had taken college-level courses; and for the fifth consecutive year, 100% of the students had graduated high school and were accepted into a four-year college. Expanded

enrollment would allow it to increase its AP and college-level courses and to offer a wider range of extracurricular activities.

If approved, CJCP planned to hire approximately twenty-eight new teachers, together with additional administrative staff to meet their staffing needs. Under the expansion, the school projected the following expenses for teacher salaries: $2,572,388 (2017-2018); $3,081,559 (2018-2019); and $3,510,006 (2019-2020).

CJCP also sought to amend its charter to add a satellite campus in New Brunswick "to increase opportunities of education equity for all students in its attendance zone." CJCP identified two facilities for consideration, but had not finalized its selection pending the approval to operate a satellite campus.

CJCP asserted that the addition of the New Brunswick satellite campus would allow for the "accessibility and replication" of the school's "existing model to service this high-need community and the increased number of students attending [the] school," and would open the opportunities offered by CJCP to "a much larger student base in need of a college education." CJCP would also "be able to cut the costs within the schools by utilizing district-wide resources between the New Brunswick and Somerset campuses."

Although CJCP served New Brunswick students, as part of its "region of

residence," it had received only ninety-three applications from families in New Brunswick for the 2016-2017 school year, of which sixteen students were enrolled through the lottery system, and seventy-seven students were placed on the waiting list. The applications from New Brunswick students for the 2016-2017 school year had doubled from the applications for the 2015-2016 school year, but were still less than expected given that there were no charter schools located in the city of New Brunswick. CJCP cited to studies that emphasized "the importance of residential proximity for charter schools to be a real option for parents," and expressed confidence that positioning the satellite campus in New Brunswick will increase the awareness of the school within the community and result in increased enrollment.

If approved, CJCP represented that it would "run an enrollment campaign" to reach out to the entire New Brunswick community. "Brochures and fliers would be translated for non-English speakers and distributed to various organizations, including but not limited to places of worship, community centers, enrichment programs and service organizations." It would also hold open houses at the school and at other locations accessible to members of the community.

CJCP projected that enrollment at the satellite campus would total:

A-3074-16T4

| Grade | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| Grade 6 | 0 | 0 | 72 | 72 |
| Grade 7 | 0 | 0 | 72 | 72 |
| Grade 8 | 0 | 0 | 0 | 72 |
| Grade 9 | 0 | 0 | 72 | 72 |
| Grade 10 | 0 | 0 | 0 | 72 |
| Grade 11 | 0 | 0 | 0 | 0 |
| Grade 12 | 0 | 0 | 0 | 0 |
| **Total** | 0 | 0 | **216** | **360** |

Lastly, CJCP sought to relocate its main facility to an approximately 90,000 square foot building located on Mettlers Road in Somerset. CJCP acknowledged that part of the reason for the request to relocate was the fact that the current "landlord's recent and unreasonable actions and legal challenges have made it impossible to stay in [the current building] beyond this school year." It also sought to relocate because the current facility did not provide enough space and amenities to accommodate its students. The new larger facility had fifty-five classrooms, a media center, cafeteria, auditorium, and conference rooms among other features. Further, although the rent for the new facility was higher, CJCP determined that considering "all factors" including legal expenses and maintenance costs, "the new facility will not significantly increase the percentage of the school's general fund allocated for the building/land rent and maintenance."

CJCP projected that enrollment at the Somerset Campus would total:

A-3074-16T4

| Grade | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| Kindergarten | 48 | 72 | 96 | 96 |
| Grade 1 | 48 | 72 | 98 | 96 |
| Grade 2 | 48 | 72 | 96 | 96 |
| Grade 3 | | 48 | 72 | 96 |
| Grade 4 | | | 48 | 72 |
| Grade 5 | | | | 48 |
| Grade 6 | 48 | 72 | 96 | 96 |
| Grade 7 | 48 | 48 | 72 | 96 |
| Grade 8 | 48 | 48 | 48 | 72 |
| Grade 9 | 48 | 48 | 48 | 48 |
| Grade 10 | 48 | 48 | 48 | 48 |
| Grade 11 | 48 | 48 | 48 | 48 |
| Grade 12 | 48 | 48 | 48 | 48 |
| **Total** | **480** | **624** | **816** | **960** |

More than 100 individuals and organizations sent letters to the Commissioner supporting CJCP's application, including the Latino Leadership Alliance of New Jersey, which expressed its "strong support" for the application.

On January 13, 2017, Franklin submitted a letter to the Commissioner asking her to deny CJCP's application. It claimed that CJCP had not demonstrated that it could meet the challenges posed by its rapid expansion, including tripling its current enrollment and opening two new facilities. Franklin maintained that this "ill-advised amendment" threatened "the educational viability of CJCP's students." It asked the Commissioner to deny the application, or in the alternative, to reduce the "proposed increase in enrollment and facilities."

Franklin claimed that CJCP had not allocated sufficient funds to attract

 A-3074-16T4

and adequately staff its schools with competent professionals, which would result in "catastrophic consequences to the viability of the school and the delivery of educational services." It calculated that the new teachers would receive an average salary of $33,486.35 per year ($937,618 (budget increase for teacher salaries) ÷ 28 (new teachers)). That annual salary for new teachers was significantly less than CJCP's median staff salary of $49,200 for the 2015-2016 school year. As a result, Franklin asserted that CJCP would "struggle to find qualified teachers to run a rigorous college preparatory curriculum." Franklin also maintained that CJCP's staffing goal for its Somerset campus did not comport with its stated goal of small class sizes and a low teacher-student ratio because it would not be fully staffed for several years after the increased enrollment.

Moreover, Franklin alleged that there was insufficient community demand for the expansion, because the lack of applications from New Brunswick families for the Somerset campus did not necessarily mean that there was community support for a satellite campus in New Brunswick. Further, CJCP sought to "expand enrollment in Somerset despite the fact[] that only 87% of the students enrolled at the CJCP Somerset campus reside in the district of residence." Franklin asserted that CJCP's "argument that more seats are

10

necessary in Somerset to meet the demand seems illogical since 13% of the students currently attending CJCP reside in a town outside the district of residence."

Next, Franklin asserted that CJCP had "a poor track record" with English Language Learners (ELL). It argued that as of the 2014-2015 school year, CJCP had not enrolled any ELL students, in contrast to the Franklin Township school district, which had 600 ELL students.

Lastly, Franklin had concerns relating to the suitability of the Mettlers Road facility. According to Franklin, the facility was apparently located in a ROL Zone (Research/Office/Laboratory Zone), where schools were not a permitted use. Although the Planning Board ultimately approved CJCP's application for a use variance, it imposed "significant conditions" on the project, which Franklin asserted "undermine[d] its viability as a school location." Moreover, CJCP's proposed location for a gymnasium was "located within the setback of a gas transmission pipeline, potentially exposing the students to a dangerous condition."

CJCP also only intended to use approximately one-half of the existing Mettlers Road facility, leaving the remainder vacant and available for lease. Thus, the property owner could lease the balance of the building to a commercial

11

office or research laboratory, thereby potentially "creating a number of security risks for the students, who would be forced to share a building." Franklin also noted that CJCP's proposal to move its main facility had resulted in "threatened/pending litigation" with its current landlord.

On January 27, 2018, the Superintendents of Edison, Highland Park, New Brunswick, Sayreville, South River, and Metuchen Township Public School Districts submitted a letter to the Commissioner opposing the applications filed by CJCP, Hatikvah, and TEECS, to expand their enrollments. They alleged that Hatikvah and TEECS, but not CJCP, "enroll a significantly more segregated student body than any of the resident or non-resident sending districts with respect to race, socioeconomic status, and need for special education."

Boards of Educations from ten other school districts, including the appellants in the companion appeal, North Brunswick, No. A-3415-16, passed almost identical resolutions calling for a general moratorium on new charter school seats in Middlesex and Somerset Counties. The Boards also alleged that Hatikvah and TEECS, but not CJCP, enrolled a "significantly more segregated student body" than any of the resident or non-resident sending districts.

By letter dated January 31, 2017, CJCP responded to each of Franklin's claims. With regard to Franklin's argument that the "existing charter schools

located in Middlesex and Somerset counties are already lacking in demand in their own designated communities," CJCP stated that it had "been experiencing an increase in demand for enrollment from students living within its sending district." It asserted that the number of applicants from its region of residence totaled: 302 (2014-2015); 684 (2015-2016); and 734 (2016-2017). For the 2017-2018 school year, CJCP had received 748 applications as of January 2017, and anticipated receiving over 1200 applications by the 2017-2018 school year deadline.

With regard to Franklin's claim that only 87% of the students enrolled in CJCP resided in the school's region of residence, CJCP explained that that number was "a result of upperclassmen high school students from outside of the attendance zone who started to attend CJCP when they were sixth graders. CJCP pointed out that as these students graduated, the ratio of students from CJCP's region of residence had increased," as follows: 71% (2014-2015); 80% (2015-2016); 87% (2016-2017). As a result, CJCP anticipated that approximately 94% of its students would reside in its region of residence in the 2017-2018 school year, and 100% by the 2018-2019 school year.

Lastly, CJCP stated that Franklin's claim that TEECS and Hatikvah enrolled a more segregated student body was a tacit admission that CJCP's

student body was representative of its sending districts. CJCP represented that the demographics of its students were: 14% (White); 17% (Hispanic); 30% (African American); 38% (Asian); and 1% (other).

By letter dated February 10, 2017, the Latino Coalition of New Jersey, a civil rights organization, and Franklin C.A.R.E.S., a group of parents of FTPS students, informed the Commissioner that they had filed a federal civil rights complaint against CJCP, alleging that CJCP engaged in segregative practices relating to enrollment of students with disabilities and ELL students.[4] CJCP responded to the allegations the next day, and "vehemently" denied engaging in any form of discrimination. CJCP stated it was an inclusive and diverse school that, for the past ten years, had been "successfully educating students from Franklin Township, North Brunswick and New Brunswick under the strict regulatory oversight of the NJDOE," and was in "complete compliance with all NJDOE regulations regarding enrollment policies."

CJCP explained that it solicited and accepted applications from all interested students. Students gained enrollment through a publicly held random lottery process that blindly selected a certain number of students to fill available

---

[4] Franklin did not include the letter or the complaint in its appendices. It also provided no information concerning the outcome, if any, of this litigation.

seats. Importantly, CJCP did not collect any information at the time of the application as to the students' socioeconomic and ethnic background, disability status, or English language skills. Any disparity in demographics of its student enrollment, as compared to FTPS, was "completely attributable to parent-choice." Further, the request to open a satellite campus in New Brunswick was "specifically designed to give more ethnically diverse, economically disadvantaged, and ELL students access to a high quality, public education."

Lastly, CJCP claimed that it had "raised the bar of what should be expected in public education in Franklin Township with a proven track record of academic success." Its students had outperformed their peers in FTPS in every subject, as represented by the 2016 PARCC test results:

2016 PARCC Results – All Students



A-3074-16T4

2016 PARCC ELA Results - Free/Reduced Lunch Students



2016 PARCC Math Results - Free/Reduced Lunch Students



On February 28, 2017, the Commissioner granted CJCP's application to amend its charter based on the recommendations and her review of the record. In a brief written decision, the Commissioner noted that the Department had "completed a comprehensive review including, but not limited to, student performance on statewide assessments, operational stability, fiscal viability, public comment, fiscal impact on sending districts, and other information in order to make a decision regarding the school's amendment request." The Commissioner confirmed the school's maximum enrollment for the "approved region of residence of Franklin, New Brunswick and North Brunswick," as

follows:

| Grade | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|
| Kindergarten | 72 | 96 | 96 |
| Grade 1 | 72 | 96 | 96 |
| Grade 2 | 72 | 96 | 96 |
| Grade 3 | 48 | 72 | 96 |
| Grade 4 | | 48 | 72 |
| Grade 5 | | | 48 |
| Grade 6 | 72 | 168 | 168 |
| Grade 7 | 48 | 144 | 168 |
| Grade 8 | 48 | 48 | 144 |
| Grade 9 | 48 | 120 | 120 |
| Grade 10 | 48 | 48 | 120 |
| Grade 11 | 48 | 48 | 48 |
| Grade 12 | 48 | 48 | 48 |
| **Total** | **624** | **1032** | **1320** |

The Commissioner also confirmed the new site location at Mettlers Road, and directed CJCP to "provide all facility related documents to the Office of Charter and Renaissance Schools and the Somerset County Office of Education." Further, the Commissioner directed that once CJCP had identified the final site of the satellite campus, it should provide the Department with the required amended documentation pursuant to N.J.A.C. 6A:11-2.6. This appeal followed.

On appeal, Franklin raises the following contentions:

POINT I

THE COMMISSIONER'S DECISION SHOULD BE REVERSED BECAUSE SHE FAILED TO CONSIDER THE SEGREGATIVE IMPACT CJCP'S

CHARTER AMENDMENT WOULD HAVE ON THE
DISTRICT.

POINT II

THE COMMISSIONER'S DECISION WAS
ARBITRARY, CAPRICIOUS, AND
UNREASONABLE.

II.

In Point I, Franklin argues that the Commissioner's decision was arbitrary, capricious and unreasonable because she failed to consider the alleged segregative impact of CJCP's charter amendment on the district. We disagree.

The scope of judicial review of a final decision of the Commissioner on a charter school application is limited. In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013). We may reverse only if the Commissioner's decision is "arbitrary, capricious, or unreasonable." Ibid. In making that determination, our review is generally restricted to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). This court "may not substitute its own judgment for the agency's even though the court might have reached a different result. . . ." In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

Charter schools are public schools that operate under a charter granted by the Commissioner, operate independently of a local board of education, and are managed by a board of trustees. N.J.S.A. 18A:36A-3(a). The Legislature found and declared that

> the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom. Specifically, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit for

educational improvement; and establish new professional opportunities for teachers.

The Legislature further finds that the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools.

[N.J.S.A. 18A:36A-2.]

It is well established that, "[r]ooted in our Constitution, New Jersey's public policy prohibits segregation in our public schools. . . ." In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 164 N.J. 316, 324 (2000). In that regard, the CSPA provides that "[t]he admission policy of the charter school shall, to the maximum extent practicable, seek the enrollment of a cross section of the community's school age population including racial and academic factors." N.J.S.A. 18A:36A-8(e). See N.J.A.C. 6A:11-4.5(e) (charter school lottery). Further, N.J.S.A. 18A:36A-7 provides:

A charter school shall be open to all students on a space available basis and shall not discriminate in its admission policies or practices on the basis of intellectual or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language, or any other basis that would be illegal if used by a school district; however, a charter school may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts. A charter school may establish reasonable criteria to

20

evaluate prospective students which shall be outlined in the school's charter.

Our Supreme Court has held that the "form and structure" of the segregative analysis under the CSPA is up to the Commissioner and the Department to determine. Englewood, 164 N.J. at 329. "The Commissioner must consider the impact that the movement of pupils to a charter school would have on the district of residence" and "be prepared to act if the de facto effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence." Id. at 328. "The Commissioner must vigilantly seek to protect a district's racial/ethnic balance during the charter school's initial application, continued operation, and charter renewal application." In re Red Bank Charter Sch., 367 N.J. Super. 462, 472 (App. Div. 2004).

> [S]egregation, however caused, must be addressed. To be timely addressed, assessment cannot wait until after a charter school has been approved for operation and is already taking pupils from the public schools of a district of residence. The Commissioner must assess whether approval of a charter school will have a segregative effect on the district of residence of the charter school. Once a charter school is operating, the Commissioner must also assess whether there is a segregative effect in any other district sending pupils to the approved charter school.
>
> [Englewood, 164 N.J. at 330.]

In response to the Court's decision in <u>Englewood</u>, and to its companion case, <u>In re Greater Brunswick Charter School</u>, 164 N.J. 314, 315 (2000), the Board adopted regulations requiring the Commissioner, prior to approval of a charter, N.J.A.C. 6A:11-2.1(j), and on an annual basis thereafter, N.J.A.C. 6A:11-2.2(c), to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence. The assessment shall be based on the enrollment from the initial recruitment period pursuant to N.J.A.C. 6A:11-4.4(a) and (b)." 32 N.J.R. 3560(a), 3561 (Oct. 2, 2000). N.J.A.C. 6A:11-4.4(a) provides that "a charter school shall submit to the Commissioner the number of students by grade level, gender and race/ethnicity from each district selected for enrollment from its initial recruitment period for the following school year."

Moreover, in response to a public comment about the readoption of the implementing regulations with amendments, the Commissioner explained that:

> 20. COMMENT: The commenter requested revisions to N.J.A.C. 6A:11-2.1 and 2.2 to ensure the Department assesses the segregative effects of charter schools not only by race, but also on religion, ethnicity and gender, students with disabilities, English language learner status, low-income students (socioeconomic status), and students at risk of dropping out or with other special academic needs.

RESPONSE: The Department assesses the segregative effects of charter schools by many factors other than race, including those referenced by the commenter, although it is not specifically required by or enumerated in N.J.A.C. 6A:11-2.1 and 2.2. The factors that are considered are predicated on the composition of the involved school districts. In light of this fact specific analysis, the Department contends revisions to N.J.A.C. 6A:11-2.1 and/or 2.2 are not necessary or warranted.

[46 N.J.R. 2351(c), 2353 (Dec. 1, 2014).]

On appeal, Franklin claims that CJCP is not representative of a cross section of the community's school age population because it over-enrolls Asian students, and under-enrolls Hispanic students, economically disadvantaged students (defined as students receiving free or reduced cost lunch), ELL students, and special needs students. However, before the Commissioner, Franklin only asserted that CJCP had a "poor track record" with ELL students, and presented no evidence to the Commissioner regarding the racial and economic segregative effects of CJCP's increased enrollment.

Further, the other opposing districts included data regarding the segregative effect of two different charter schools, but not CJCP, and there is no indication in this record whether the Latino Coalition and Franklin C.A.R.E.S presented any substantiated evidence of a segregative effect on the district. Thus, there was nothing in this record to support Franklin's assertion that CJCP's

enrollment practices will have a segregative effect on the district. <u>Red Bank</u>, 367 N.J. Super. at 472-85.

It was also undisputed that CJCP did not discriminate in its admission policies or practices. In accordance with the CSPA, CJCP operated a publicly-held random race-blind lottery. In addition, CJCP did not collect any data at the time of the application about the students' socioeconomic and ethnic background, disability status, and English language skills.

Additionally, even if Franklin had presented the information about student enrollment data to the Commissioner at the time she was considering CJCP's application, it would not have presented a basis to reject the application. Franklin compared the racial/ethnic demographics of CJCP and TEECS (not a party to this appeal) students, with FTPS students for the school year 2016-2017, as follows:

| Demographic | FTPS Students | CJCP Students | TEECS Students |
|---|---|---|---|
| White | 12.8% | 13.3% | 14.7% |
| Asian | 16.0% | 34.0% | 67.6% |
| Hispanic | 25.4% | 18.8% | 3.5% |
| Black | 37.4% | 31.1% | 12.6% |
| Free or reduced price lunch | 47.7% | 28.0% | 7.0% |
| Special Education | 16.0% | 8.0% | 3.0% |
| ELL or LEP | 7.0% | 0% | 3.0% |

It also cited to the change in CJCP's demographics, as follows:

24

| CJCP's Demographics | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|---|
| White | 6.6% | 8.0% | 9.5% | 12.0% | 13.3% |
| Asian | 5.7% | 7.7% | 15.4% | 19.6% | 34.0% |
| Hispanic | 20.4% | 21.4% | 20.9% | 20.3% | 18.8% |
| Black | 66.7% | 62.3% | 53.9% | 47.5% | 31.1% |
| Economically disadvantaged | 33.0% | 44.0% | 43.0% | 39.0% | 28.0% |
| ELL or LEP | 0% | 0% | 0% | 0% | 0% |
| Special education | 8.0% | 9.0% | 7.0% | 7.0% | 8.0% |

The demographics cited by Franklin do not present a sufficient basis for assessing segregative effect. The data provided shows some disparity between the enrollment of Asian, Hispanic, economically disadvantaged, and ELL students in FTPS. Significantly, however, Franklin does not argue that FTPS are becoming more segregated, and in fact, the data submitted by the Commissioner indicates that they have not. See Bd. of Educ. of Morris Sch. Dist. v. Unity Charter Sch., EDU 1797-02, final decision, (May 22, 2003) ("student population for purposes of comparison with a charter school is not the public school enrollment of the district of residence, but 'the community's school age population,' a group for which no comparison can here be made, since the present record is virtually devoid of information about it").

As the Commissioner correctly points out, the District's student demographics, including socioeconomic and racial demographics, have, as set forth below, remained relatively static from the 2010-2011 to the 2015-2016

25

school year, and thus there was no indication that CJCP's operations were exacerbating the racial imbalance:

| Students Pre-K to 12 | Franklin 2010-2011 | Franklin 2016-2017 |
|---|---|---|
| White | 18.7% | 13.7% |
| Black or African American | 40.3% | 38.0% |
| Asian | 18.4% | 16.7% |
| Hispanic | 21.5% | 29.5% |
| LEP | 5.1% | 7.8% |
| Special needs | 15.2% | 16.0% |
| Free or reduced lunch | 36.6% | 45.0% |

A comparison of the demographic data indicates that CJCP enrolled a diverse student population, albeit, a population that did not exactly match FTPS demographics. Moreover, CJCP maintained that the expansion and the operation of a satellite campus in New Brunswick would allow it to develop an even more diverse student population. To that end, Franklin has not presented any evidence that the District was becoming more segregated, or that CJCP's existence has worsened the existing racial imbalance. See Bd. of Educ. of Hoboken v. N.J. State Dep't of Educ., No. A-3690-14 (slip op. at 15) (App. Div. June 29, 2017) (affirmed charter renewal where there were no allegations that the school's practices after the enrollment of students by an impartial lottery exacerbated the racial or ethnic balance); see also In re Renewal Application of TEAM Acad. Charter Sch., ___ N.J. Super. ___, ___ (slip op. at 14) (stating that "[t]he mere fact that the demographics of the charter schools do not mirror the

26

demographics of the [d]istrict does not alone establish a segregative effect.").

In that regard, this case is distinguishable from Red Bank, 367 N.J. Super. at 462. In that case, the Board of Education (Board) appealed from the Commissioner's decision approving an application by a charter school to renew its charter. Id. at 467. The Board opposed the application on the basis that the school's operation had worsened the racial/ethnic imbalance, citing to data showing that since the charter school opened, the percentage of non-minority students in the traditional public schools had decreased from 32% to 18%, and a disproportionate number of non-minority students were enrolled in the charter school. Id. at 469. The Board also alleged that prior to standardized testing, the charter school frequently returned enrolled minority students with poor academic records to the traditional public schools. Id. at 479.

The Commissioner in Red Bank did not specifically address the segregation argument below. Id. at 476. However, this court discerned from the entire record, including the Commissioner's brief on appeal, that the Commissioner had concluded there was "no evidence in the record to suggest that the charter school has promoted racial segregation among the district's school-age children," and "there is no requirement that the two schools have exactly the same minority/non-minority enrollment figures." Ibid. (internal

quotation marks omitted). We held that "the Commissioner is to assess whether or not the charter school is seeking 'a cross section of the community's school age population.'" Ibid. (quoting N.J.S.A. 18A:36A-8(e)).

Despite the disparity in the enrollment, we affirmed the Commissioner's decision, finding that:

> The Charter School should not be faulted for developing an attractive educational program. Assuming the school's enrollment practices remain color blind, random, and open to all students in the community, the parents of age eligible students will decide whether or not to attempt to enroll their child in the Charter School and any racial/ethnic imbalance cannot be attributed solely to the school. To close this school would undermine the Legislature's policy of "promoting comprehensive educational reform" by fostering the development of charter schools. N.J.S.A. 18A:36A-2.
>
> [Id. at 478.]

Nonetheless, this court found that the school's post-enrollment practices were "disturbing and difficult to dismiss on this record." Id. at 480. Additionally,

> [w]hile the Charter School's enrollment practices might not be the sole cause of existing racial/ethnic imbalance, the manner of operation of the school after its color-blind lottery, warrants closer scrutiny to determine whether some of the school's practices may be worsening the existing racial/ethnic imbalance in the district schools.

28

[Ibid.]

Thus, we remanded the matter to the Commissioner to determine "whether any remedial action is warranted." Id. at 482. Here, and unlike in Red Bank, there are no allegations that CJCP's practices, after the enrollment of students by an impartial lottery, exacerbated the racial, ethnic, or special needs balance in FTPS. Franklin does not cite to any policy or procedure utilized by CJCP in a manner to further exacerbate that balance. Instead, Franklin simply claimed, in general terms, that CJCP was more segregated than the FTPS—a claim insufficient to warrant further review on an application to amend.

This case is also distinguishable from two other cases cited by Franklin. In In re Petition for Authorization to Conduct a Referendum on the Withdrawal of North Haledon School District from the Passaic County Manchester Regional High School District, 181 N.J. 161, 183 (2004), the Court reversed the grant of North Haledon's petition to withdraw from the Passaic County Manchester Regional High School District. The Court found that "demographic trends are contributing to a steady decrease in the number of white students attending Manchester Regional, and that North Haledon's withdrawal will accelerate this trend." Ibid. The Court held that "[r]ather than using the demographic trend as an excuse for approving North Haledon's petition, the Board should have

considered the ameliorative effect of denying the petition on the racial balance at Manchester Regional." Ibid.

Similarly, in Board of Education of Englewood Cliffs v. Board of Education of Englewood, 257 N.J. Super. 413, 459-65 (App. Div. 1992), aff'd, 132 N.J. 327, cert. denied, 510 U.S. 991 (1993), the Appellate Division affirmed the State Board of Education's denial of Englewood Cliffs' petition to withdraw from the sending/receiving relationship due to the substantial negative impact on the racial balance in the district. In contrast, here, Franklin did not show that CJCP's expansion will increase the racial imbalance as in North Haledon and Englewood Cliffs. In fact, it appears from the data submitted by the Commissioner that the racial demographics have remained fairly consistent during CJCP's operation.

Lastly, it is undisputed that the Commissioner considered the segregative effect of the charter school in approving CJCP's application to open the school in 2006, N.J.A.C. 6A:11-2.1(j), in renewing its application in 2010 and 2015, N.J.A.C. 6A:11-2.3(b)(8), and on an annual basis, N.J.A.C. 6A:11-2.2(c). There is no indication in this record that there was any challenge based on the segregative effect either in the initial approval or on renewal. Nor is there any indication in this record that the Commissioner found a segregative effect during

30

the annual review.  N.J.A.C. 6A:11-2.2(c).

Based upon the foregoing, we conclude that the Commissioner's decision granting the expansion was not arbitrary, capricious, or unreasonable because Franklin did not provide sufficient evidence of a segregative effect to warrant either a more detailed scrutiny or the denial of the application.  Therefore, we reject Franklin's contention on this point.

### III.

In Point II, Franklin argues that the Commissioner's decision approving the amendment was arbitrary, capricious and unreasonable because she failed to consider "serious deficiencies and problems in CJCP's application." Specifically, Franklin contends the Commissioner failed to consider that: 1) CJCP sought to expand too rapidly; 2) CJCP's staffing plan was unrealistic; 3) there was a lack of community demand for the New Brunswick campus and no demonstrated need for additional seats at the Somerset campus; 4) CJCP has a "poor track record" with ELL students; 5) the proposed location of the Somerset campus is unsuitable for a school; and 6) CJCP may become involved in expensive litigation with its current landlord.  We are unpersuaded by these arguments.

Applications to establish a charter school are governed by N.J.S.A.

31

18A:36A-4 and -5, and the implementing regulation, N.J.A.C. 6A:11-2.1. The Commissioner has final authority to grant or reject a charter. N.J.S.A. 18A:36A-4(c). "The notification to eligible applicants not approved as charter schools shall include reasons for the denials." N.J.A.C. 6A:11-2.1(f) (emphasis added).

Applications to renew a charter are governed by N.J.S.A. 18A:36A-17 and the implementing regulation, N.J.A.C. 6A:11-2.3. The Commissioner shall grant or deny the renewal of a charter based upon a comprehensive review of the school, including, among other things, the annual reports, recommendation of the district board of education or school superintendent, and student performance on statewide tests. N.J.A.C. 6A:11-2.3. "The notification to a charter school that is not granted a renewal shall include reasons for the denial." N.J.A.C. 6A:11-2.3(d) (emphasis added).

With particular reference to the case at hand, a charter school can also apply to the Commissioner for an amendment to its charter. N.J.A.C. 6A:11-2.6. A charter school can seek, as in this case, an expansion of enrollment and the establishment of a new satellite campus. N.J.A.C. 6A:11-2.6(a)(1)(i), (iv). Boards of Education in the district of residence can submit comments in response to the application for amendment. N.J.A.C. 6A:11-2.6(c).

"The Commissioner may approve or deny amendment requests of charter

schools and shall notify charter schools of decisions. If approved, the amendment becomes effective immediately unless a different effective date is established by the Commissioner." N.J.A.C. 6A:11-2.6(d). In determining whether the amendments are eligible for approval, the Department "shall evaluate the amendments" based on the CSPA and the implementing regulations, and the Commissioner "shall review a charter school's performance data. . . ." N.J.A.C. 6A:11-2.6(b). A school's performance data is reflected in the school's Academic Performance Framework report. N.J.A.C. 6A:11-1.2. The Performance Framework consists of three sections: academic, financial, and organizational. N.J.A.C. 6A:11-1.2. A charter school's performance on the Academic section carries the most weight. That component includes measures of student growth, achievement, graduation rate, and attendance. N.J.A.C. 6A:11-1.2.

An appellate court may reverse a Commissioner's decision on a charter school application only if it is "arbitrary, capricious, or unreasonable." Quest Acad., 216 N.J. at 385. "[T]he arbitrary, capricious, or unreasonable standard . . . subsumes the need to find sufficient support in the record to sustain the decision reached by the Commissioner." Id. at 386. "[A] failure to consider all the evidence in a record would perforce lead to arbitrary decision making." Ibid.

A-3074-16T4

However, in cases where "the Commissioner is not acting in a quasi-judicial capacity," and is instead acting in [her] legislative capacity, as [s]he was doing here, [s]he "need not provide the kind of formalized findings and conclusions necessary in the traditional contested case." TEAM Acad., ___ N.J. Super. ___ (slip op. at 30) (quoting In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000)).

Thus, although the arbitrary, capricious, or unreasonable standard demands "that the reasons for the decision be discernible, the reasons need not be as detailed or formalized as an agency adjudication of disputed facts; they need only be inferable from the record considered by the agency." Englewood, 320 N.J. Super. at 217. See Red Bank, 367 N.J. Super. at 476 (reasons need not be detailed or formalized, but must be discernible from the record); Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. State Bd. of Educ., 172 N.J. Super. 547, 552 (App. Div. 1980) (detailed findings not required by Commissioner in reducing amount local school board sought to increase its budget).

There is also no statutory or regulatory provision requiring the Commissioner to include reasons for granting an application to amend. TEAM Acad., ___ N.J. Super. ___ (slip op. at 40). The regulations provide only that

the notification "shall include reasons for the denial[]" of an initial charter school application and an application for renewal. N.J.A.C. 6A:11-2.1(f); N.J.A.C. 6A:11-2.3(d). The Commissioner does however, take comments regarding the amendment into consideration when rendering a final decision. N.J.A.C. 6A:11-2.6(c). Here, although the Commissioner did not specifically address the comments submitted by Franklin in its opposition to CJCP's application, a review of the record indicates that none of the issues raised by Franklin presented a basis to deny the amendment.

First, Franklin argues that CJCP failed to present sufficient evidence of a need for a satellite campus in New Brunswick. A charter school can seek an amendment to open a new satellite campus. N.J.A.C. 6A:11-2.6(a)(1)(iv). See Educ. Law Ctr. ex rel. Burke v. N.J. State Bd. of Educ., 438 N.J. Super. 108, 112 (App. Div. 2014) (affirmed State Board's action in adopting regulations allowing satellite campuses). A satellite campus is defined as "a school facility operated by a charter school that is in addition to the facility identified in the charter school application or charter, if subsequently amended." N.J.A.C. 6A:11-1.2. "A charter school may operate more than one satellite campus in its district or region of residence, subject to charter amendment approval, pursuant to N.J.A.C. 6A:11-2.6." N.J.A.C. 6A:11-4.15(b).

The Department evaluates whether amendments are eligible for approval based on the CSPA. N.J.A.C. 6A:11-2.6(b). Under the CSPA, a charter must include information showing a "[d]emonstration of need" in its initial application for a charter. N.J.A.C. 6A:11-2.1(b)(2)(vi). Franklin contends that CJCP did not demonstrate a need for the satellite campus because it cited only to a lack of demand from New Brunswick families.

However, in its application, CJCP presented a detailed rationale for the addition of a satellite campus—a record that amply supports the Commissioner's decision. Notably, CJCP set forth that New Brunswick's high percentage of economically disadvantaged students (86% (high school) and 93% (middle school)), would benefit from easier access to CJCP. It also cited to studies that "emphasize[d] the importance of residential proximity for charter schools to be a real option for all parents."

Moreover, CJCP demonstrated need because even though it received fewer applications than expected from New Brunswick students in 2016-2017, it still received double the number of applications from 2015-2016, and seventy-seven of the ninety-three students were placed on the waiting list. CJCP also represented that the total number of applications had dramatically increased over the past few years (465 for the 2014-2015 school year and 956 for the 2016-

2017 school year), and that at the time of the application, there were 628 students on its waiting list.

Second, Franklin argues that CJCP failed to demonstrate need because only 87% of the students enrolled at the Somerset campus were from CJCP's region of residence. However, CJCP explained that number was "a result of upperclassmen high school students from outside of the attendance zone who started to attend CJCP when they were sixth graders. As these students graduate, the ratio of students from CJCP's region of residence attending CJCP has increased," as follows: 71% (2014-2015); 80% (2015-2016); 87% (2016-2017). CJCP anticipated that approximately 94% of its students would reside in its region of residence in the 2017-2018 school year, and 100% by the 2018-2019 school year.

Third, Franklin argues that the Commissioner ignored the fact that CJCP had a "poor track record in enrolling ELL students." It asserts that 14% of the students enrolled in traditional public schools in New Brunswick are ELL students, and that CJCP has not demonstrated that it is able to serve this student population. However, there was no evidence that CJCP utilized any policy or procedure, either before or after the lottery, to exclude ELL students. It was also undisputed that students gain admission to CJCP through a publically held

random lottery process that blindly selects students from among the applicant pool, and CJCP did not collect any information prior to the lottery as to a student's English language skills. Further, CJCP maintained that it sought to open a satellite campus in New Brunswick in order to reach more ELL students.

Franklin also failed to present any evidence that CJCP was unable to serve the population of ELL students. It was undisputed that CJCP complied with NJDOE regulations during its ten years of operation, including N.J.A.C. 6A:11-4.8, which provides that "[a] charter school shall provide an enrolled limited English proficient student with all required courses and support services to meet the New Jersey Student Learning Standards in accordance with N.J.S.A. 18A:7A-4 and 18A:7A-5 and N.J.A.C. 6A:15, Bilingual Education."

Fourth, Franklin argues that the Commissioner failed to address its concern that the increased enrollment at the Somerset campus and the creation of the satellite campus will cause "catastrophic staffing issues due to unrealistic teacher salaries." However, there is no indication in this record that CJCP proposed to pay its teachers less than the amount required under the CSPA. In this regard, N.J.S.A. 18A:36A-14(b) provides that "[a] charter school shall not set a teacher salary lower than the minimum teacher salary specified pursuant to section 7 of P.L.1985, c.321 (C.18A:29-5.6) nor higher than the highest step in

the salary guide in the collective bargaining agreement which is in effect in the district in which the charter school is located." See also 34 N.J.R. 2920(a) (Aug. 19, 2002) ("Charter schools pay their teachers and professional staff not less than the State minimum salary nor more than the salaries of the district boards of education in which the charter schools are located").  Therefore, Franklin's contention on this point also lacks merit.

Fifth, Franklin contends that the Commissioner ignored its safety concerns about the Mettlers Road location.  However, prior to opening the new campus, CJCP must submit to the NJDOE the new lease, mortgage, or title to the facility, a valid certificate of occupancy for educational use issued by the local municipal enforcing official, a sanitary inspection report with a satisfactory rating, and a fire inspection certificate with an "Ae" (education) code life hazard.  N.J.A.C. 6A:11-2.1(i)(6)-(9).  The regulations are designed to ensure that facilities are safe for students.  Thus, none of the issues raised by Franklin in opposition to the application form a basis for denying the application.

In sum, we are satisfied that the administrative record amply supports the Commissioner's decision to grant CJCP's request to amend its charter.  CJCP demonstrated that it is a high-performing, Tier 1 school, a ranking it received

from the Department's assessment of its academic performance based on the metrics set forth in the State's Academic Performance Framework governing charter schools. N.J.A.C. 6A:11-1.2; N.J.A.C. 6A:11-2.3(b). In 2015-2016, CJCP students ranked in the 99th percentile statewide for Math on the PARCC and outperformed their home district on the 2016 PARCC in every subject. It was also awarded the National Blue Ribbon Award in 2016, named a High Performing Title I Reward School in 2015, featured as a Top Performing High School in U.S. News and World Report in 2015 and 2016, and designated as a "Top Ten Middle School" by JerseyCAN in 2013.

Thus, a review of CJCP's performance data clearly supported the need for the amendment. N.J.A.C. 6A:11-2.6(b). Further, in the application and annual reports submitted by CJCP during its ten-year operation, it demonstrated that it was fiscally stable and operationally sound. Finally, the Commissioner properly approved CJCP's request to expand enrollment with the understanding that facilities would need to be identified, secured, and potentially improved to comply with the charter regulations. Under these circumstances, we discern no basis for disturbing the Commissioner's reasoned determination.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3074-16T4