**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1950-21

IN THE MATTER OF THE
GRANT OF RENEWAL
APPLICATION OF THE
RED BANK CHARTER
SCHOOL, 2022-2027.

_____

Argued April 15, 2024 – Decided April 25, 2024

Before Judges Sabatino, Mawla, and Vinci.

On appeal from the New Jersey Department of Education.

Aron Grant Mandel argued the cause for appellant The Board of Education of the Borough of Red Bank (The Busch Law Group LLC, attorneys; Jonathan Matthew Busch, of counsel; Nicholas Celso, III, and Aron Grant Mandel, of counsel and on the briefs).

Francesco Ferrantelli, Jr., argued the cause for respondent Commissioner of Education (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Amna T. Toor, Deputy Attorney General, on the brief).

Thomas Owen Johnston argued the cause for respondent Red Bank Charter School, Inc. (Johnston Law Firm LLC, attorneys; Thomas Owen Johnston, of

counsel and on the brief; Jaryda A. Gonzalez, on the brief).

PER CURIAM

The Board of Education of the Borough of Red Bank ("the School Board") appeals from the February 1, 2022 final agency decision of the then-Acting Commissioner of the New Jersey Department of Education ("DOE"), renewing the charter of the Red Bank Charter School ("RBCS") for the 2022-2027 five-year term. Over the objection of the School Board, the Acting Commissioner approved RBCS's renewal application based primarily on the school's academic performance, fiscal viability, and operational stability.[1] The School Board opposed renewal, arguing that RBCS has contributed to a racial/ethnic, socio-economic, and academic demographic imbalance within the Red Bank school district.

The Acting Commissioner's renewal decision only briefly mentioned the racial/ethnic demographic issues, without analyzing them in detail utilizing an explicitly defined standard for impermissible segregative impact. The renewal decision also omitted a substantive analysis of other required considerations,

---

[1] During the pendency of this appeal, a new Commissioner of Education has been nominated, and is serving as Acting Commissioner.

including segregative impacts on students with disabilities, English Language Learner ("ELL") students, and economically disadvantaged students.

Among other things, the School Board argues the Acting Commissioner's decision was arbitrary, capricious, and unreasonable and not entitled to deferential review because it failed to adequately consider RBCS's segregative impact on the Red Bank school district, and this and other failures violated both public policy and legislative mandate. The School Board requests this court reverse the renewal decision—thereby revoking RBCS's charter—or, in the alternative, either exercise original appellate jurisdiction and determine this case on the merits or retain jurisdiction and appoint a Special Adjudicator.[2]

RBCS joins with the Attorney General (as counsel to the Acting Commissioner) in opposing the School Board's appeal. Among other things, respondents contend any alleged shortcomings in the Acting Commissioner's renewal decision are cured by explanations set forth in the Attorney General's appellate brief and the data contained in a "renewal summary report" that was issued after the Acting Commissioner's decision. Respondents contend the

---

[2] The School Board requests the appointment of a Special Master. We use the term "Special Adjudicator" because the Judiciary recently announced it is substituting the term "Special Adjudicator" for "Special Master." See Sup. Ct. of N.J., Notice to the Bar: Supreme Court Announces Adoption of Term "Special Adjudicator" to Replace use of "Special Master" (April 5, 2024).

Acting Commissioner's renewal decision, coupled with the later-issued renewal summary report, satisfied her obligations under the statutory scheme, because the form and substance of her decision is left to her discretion. On the merits, respondents point to substantial growth in the percentages of minority students enrolled at RBCS since its last renewal, and the educational benefits provided by RBCS's program.

For the reasons that follow, we remand this matter to require the present Acting Commissioner to address in an amplified final agency decision, with appropriate reasoned analysis, the issues of segregative impact required by the applicable statutes, regulations, and case law. As part of that analysis, the Acting Commissioner must clarify the methodology the DOE is using to assess segregative impact in this charter school renewal context. The Acting Commissioner shall also delineate the analysis of any segregative impact of the charter school's renewal on ELL students, students with disabilities, and economically disadvantaged students. Lastly, the Acting Commissioner shall address in the amplification other discrete subjects identified in this opinion that bear upon whether renewal of RBCS's charter is arbitrary, capricious, or unreasonable.

A-1950-21

I.

Given that we are remanding this matter for additional findings, and the parties are well familiar with the facts and RBCS's oft-litigated history, we need not present the factual and procedural background comprehensively. The following summary will suffice for this opinion.

RBCS's History

RBCS's student demographic composition and whether it has contributed to segregation within the Red Bank school district has been the subject of dispute in the over two decades since the inception of RBCS. We incorporate by reference that history as detailed in our 2019 opinion, which addressed an outside challenge to RBCS's enrollment practices. See In re Grant of the Charter Renewal of the Red Bank Charter Sch. ("Red Bank II"), No. A-3342-16 (App. Div. Sept. 20, 2019).

The pertinent history begins with the 1998 approval of RBCS's initial charter application. The School Board challenged the application, arguing in part that "the grant of a charter in this case will violate the New Jersey Law Against Discrimination, Title VI of the Civil Rights Act and the Equal Educational Opportunities Act." The State Board of Education found this argument "speculative" and not supported by "actual enrollment data."

However, it added that "given the racial composition of Red Bank, the Commissioner should review the racial composition of the student population of the [RBCS] before granting final approval."

The Red Bank I Decision

In 2001, RBCS filed a renewal application, and sought to expand its class size to include kindergarten through third grade and increase enrollment in its existing grades four through eight. In re Red Bank Charter Sch. ("Red Bank I"), 367 N.J. Super. 462, 468 (App. Div. 2004). The School Board challenged the application, contending that the school exacerbated the racial/ethnic imbalance within the school district and that a hearing was required to fully assess this point. Id. at 469. In response, RBCS attributed the decreased number of White students within the district schools[3] to personal family decisions on schooling and argued that this "[W]hite flight" had been occurring even prior to RBCS's opening.[4] Id. at 469-70. The Commissioner renewed RBCS's charter and

_____

[3] For purposes of this opinion, the term "district schools" refers to the public elementary and middle schools in Red Bank, since RBCS has a pre-kindergarten through eighth-grade program.

[4] The demographic categorizations herein are largely based on the language used by the parties in their briefs and appendices. When we are not referring to the parties' specific categorizations, we replace "Hispanic" with "Hispanic/Latino," as these two categorizations were sometimes used together

6                                                          A-1950-21

approved the expansion request, without reference to the segregation charges. Id. at 470.

Following an administrative appeal, the State Board of Education affirmed the Commissioner's decision, concluding that the School Board had failed to "demonstrate[] that the Charter School has had a segregative effect on the district's schools or that expansion of the School will have an impermissible impact on the racial composition of the district's schools." Ibid.

The School Board appealed to this court, and in a 2004 published opinion, we affirmed the renewal decision. Id. at 468. Although the Commissioner's decision failed to expressly address the segregation argument, we "discern[ed] from the entire record"—including from the Commissioner's brief on appeal— that the Commissioner found no evidence that RBCS "has promoted racial segregation." Id. at 476. We rejected in Red Bank I the School Board's segregation arguments on the ground that it had "used the wrong population base" (by comparing RBCS's demographics with Red Bank's general population,

_____

or interchangeably but refer to two distinct demographic groups. Similarly, we replace the phrase "students with special needs" with "students with disabilities," as the latter is more inclusive. Because the parties' racial/ethnic segregation arguments are limited to White and Hispanic/Latino students, we confine our discussion to these two groups as well.

not its relevant school-aged population) "and failed to establish causation" by not considering the "pre-existing 'white flight' trend." Id. at 477.

That said, we observed in Red Bank I that "the enrollment statistics clearly demonstrate that [RBCS] has a significantly higher percentage of non-minority students than the district schools." Id. 477-78. While we noted there were no objections to RBCS's random admissions lottery, we considered the School Board's arguments about how RBCS may otherwise be manipulating its student population—such as allegedly pushing minority students out of the school or using its waitlist and sibling preference policy (which gives preference to applicants who have siblings already enrolled at RBCS) "to further exacerbate racial/ethnic imbalance." Id. at 478-79. We recognized those allegations were "difficult to dismiss on this record." Id. at 480. Thus, without disturbing the renewal decision, we remanded the matter for a hearing to determine whether any of RBCS's policies and practices exacerbated the district's racial/ethnic imbalance, and whether any remedial action was warranted. Id. at 481, 486.

This administrative hearing directed by Red Bank I never occurred because the School Board and RBCS entered into a consent order resolving the litigation. The subsequent renewal periods passed, apparently without issue. Red Bank II, (slip op. at 13).

<u>Red Bank II</u>

In 2017, the DOE again renewed RBCS's charter by way of a "short, congratulatory letter." <u>Red Bank II</u>, (slip op. at 14). Two nonprofit coalition groups in Red Bank appealed that renewal. <u>Ibid.</u> In response, the then-Commissioner submitted an Amplification of Reasons explaining the renewal decision. <u>Id.</u> at 14-15.

As we summarized in our <u>Red Bank II</u> decision, the Amplification provided three main reasons for the Commissioner's decision: "(1) RBCS's favorable student performance on statewide assessments; (2) operational sustainability; and (3) demographic enrollment data and public comment." <u>Id.</u> at 15. The Commissioner acknowledged that RBCS's racial/ethnic composition, on its face, did not "currently reflect the community's school-age population," but nonetheless concluded that RBCS had taken "sufficient action" to address this racial imbalance. <u>Id.</u> at 15-16. As part of her assessment, the Commissioner considered: the limited opportunities for new students to enroll because RBCS had twenty students per grade and there was a low attrition rate; RBCS's advertising and recruiting in Spanish and English and its targeting of "high-needs communities"; a 33% increase in incoming Hispanic pre-kindergarten students as compared to the last academic year; and RBCS's implementation of

a weighted lottery.[5]  Id. at 16-17.  After comparing the student populations between RBCS and the district schools, the Commissioner found there was no compelling evidence that RBCS had a segregative effect on the district schools. Id. at 17.

Thereafter, we remanded the case to the Commissioner for further "proceedings" to allow the parties to supplement the record based on the new information considered in the Amplification of Reasons.  Id. at 17.  The remand resulted in a second Amplification of Reasons (by a different Commissioner), affirming the renewal of RBCS's charter.  Id. at 21-24.  Responding to the arguments raised by the coalition groups, the then-Commissioner disagreed that RBCS's advertising and recruitment practices favored White families.  Id. at 22. He endorsed RBCS's 3:2 weighted lottery "as a tool to promote enrollment of economically disadvantaged students" and "to ensure that RBCS's enrollment represent[ed] a cross-section of the community's school-age population."  Id. at 23.  Although the sibling preference policy limited the number of available seats,

---

[5]  A "weighted lottery" is defined as "a random selection process that provides additional weight or increased chances to individual students who are identified as part of a specified set of educationally disadvantaged students but does not reserve or set aside seats for individual students or sets of students."  N.J.A.C. 6A:11-1.2.  RBCS's weighted lottery favored applicants who qualified as economically disadvantaged, entering their names into the lottery three times, as opposed to only twice.  Red Bank II, (slip op. at 16 n.4).

the Commissioner contemplated that the weighted lottery would result in improved demographics better reflecting the community's population, which in turn would benefit those siblings as well. Id. at 23-24. He pledged that the DOE "will continue to monitor RBCS's demographics and will consider revisiting both the weighted lottery and sibling preference if the trend does not continue." Id. at 24.

Following that amplified agency decision, the coalition groups proceeded with their appeal of the renewal decisions in Red Bank II. They argued that both Commissioners' decisions failed to address their claims against RBCS's allegedly discriminatory enrollment practices—which purportedly suppressed Hispanic/Latino student enrollment and perpetuated White enrollment at far higher levels than at the district schools. They further claimed the agency erred in failing to suspend RBCS's sibling preference policy and by not addressing RBCS's allegedly faulty recruitment methods. Id. at 2-3.

In Red Bank II, we declined to disturb the sibling preference policy, concluding there was sufficient support for the Commissioners' determinations that the sibling preference policy—coupled with the weighted lottery program—likely would increase the number of incoming Hispanic/Latino students in the future. Id. at 38-40. We specifically credited the Commissioner's representation

that he would continue to monitor RBCS's demographics and would revisit both the sibling preference and the weighted lottery policies if the upward trend in Hispanic/Latino enrollment did not continue. Id. at 40.

However, we determined that RBCS's recruitment and advertising policies required further examination by the DOE and requested the Commissioner to make a third Amplification of Reasons on this point. Id. at 42-43. We further noted that the impact of the weighted lottery and RBCS's advertising/recruitment "may be considered anew" in the next charter renewal cycle in 2021, and thus would "shed further light on whether the weighted lottery is working in a desirable fashion, and whether the school's most recent advertising measures to the community are timely and effective." Id. at 43, 45.

In December 2019, the Commissioner issued a third Amplification of Reasons, affirming RBCS's charter renewal. The Commissioner determined that, "consistent with its statutory and constitutional obligations," RBCS was "taking all practicable steps to recruit and enroll a cross-section of the community's school-age population," and there was no evidence of corruption in RBCS's lottery system.

A-1950-21

The Current Renewal Application

In October 2021, RBCS submitted its charter renewal application for the next term of 2022-2027. The application included general information about the school's curriculum, student achievement, community engagement, administration, and budget. RBCS also discussed its programs for students with disabilities and ELL students. As in the past, it listed its projected maximum enrollment at 200 students, with twenty students per each grade level (from pre-kindergarten through eighth grade). Its application also included a table with the school's current demographics.

The School Board submitted opposition to this newest renewal application. The opposition included letters from the School Board, local school superintendents, various firms, organizations, and concerned families; a Borough Council resolution opposing renewal; and press releases and news articles. In its letter, the School Board alleged that RBCS caused "a demographic imbalance between the two school systems," and that RBCS's demographics did not "reflect the K-8 population of Red Bank."

RBCS submitted a response in further support of its renewal application. In addition to reiterating its prior arguments and including support letters from families and community members, RBCS's response included "NJ School

Performance Reports," which are annual reports prepared by the DOE addressing school performance and student achievement data and include the school's demographic data for each academic year. See N.J.A.C. 6A:33-1.3.

RBCS also submitted to the DOE racial/ethnic demographic data for Red Bank's student population based on the United States census for 2019. The School Board responded with a further submission, reiterating that a charter school's admissions policy must reflect a cross-section of the community, which includes racial/ethnic differences as well as academic differences, such as ELL and students with disabilities. The School Board argued that RBCS's student composition reflected segregation in these additional areas as well.

The agency record on appeal includes several additional documents, containing more data. This includes figures about enrollment at RBCS, which listed the number of students anticipated for each racial/ethnic demographic for each grade level, for academic years 2017-2018 through 2021-2022.

The Commissioner's Renewal Decision and the Ensuing Renewal Summary Report

On February 1, 2022, the then-Acting Commissioner approved RBCS's renewal application. In her two-page approval letter, the Acting Commissioner stated the DOE had "completed a comprehensive review of RBCS including but not limited to, the renewal application, annual reports, student performance on

statewide assessments, a structured interview with school officials, public comments, student composition of RBCS, and the fiscal impact on the sending district." The Commissioner noted RBCS's academic ranking over the years and found that RBCS "met standard[s]" on various fiscal and performance measures. The Commissioner also stated that a "Renewal Summary Report, which contain[ed] the findings gathered from [DOE's] comprehensive review, [wa]s forthcoming."

The Renewal Summary Report was issued months later, on July 26, 2022. That lengthy document, consisting mainly of data and charts with associated narrative commentary, summarized what it characterized as the DOE's "comprehensive review" of RBCS, in consideration of the following: "student performance on statewide assessments; annual reports; monitoring visit results; financial reports; public comments; possible effect of charter school enrollment on district(s) of residence that could lead to segregation of students; financial impact on district(s) of residence; and other relevant evidence."

The Renewal Summary Report noted that since 2017, RBCS has annually enrolled 180 students (twenty students per grade, from kindergarten through

15

eighth grade).[6]   The report included racial/ethnic demographic data for both RBCS and Red Bank district schools.  Utilizing a "Performance Framework," the DOE concluded in the Renewal Summary Report that RBCS was faithful to its mission and charter; had a comprehensive curriculum; provided high-quality instruction; had a productive student assessment system; had a clear and well-functioning organizational structure; promoted a safe, respectful, and supportive culture; actively engaged families and the community; had a capable Board of Trustees; and satisfied state/federal law and reporting requirements.[7]

Relevant to our purposes, the DOE found in the report that RBCS had "demonstrate[d] a commitment to serving and meeting the needs of all students, especially the highest need students requiring special education services, [ELL students], students who qualify for free or reduced-price lunch and other underserved or at-risk populations."  The DOE noted that RBCS's weighted lottery gave preference to economically disadvantaged students, and highlighted recruitment methods, which included Spanish-language newspapers.

---

[6]  For whatever reason, the report's enrollment data did not include RBCS's pre-kindergarten class.

[7]   The term "Performance Frameworks" is defined as the Department of Education's "accountability system" to assess "the academic, financial, and organizational performance of each charter school."  N.J.A.C. 6A:11-1.2.

Based on this review, the Acting Commissioner renewed RBCS's charter. The School Board moved for reconsideration of the renewal, which the Acting Commissioner denied.

The School Board then appealed the Acting Commissioner's decision. RBCS and the Attorney General, as counsel to the Acting Commissioner, each submitted briefs in opposition to the School Board's appeal. As we will discuss, the Attorney General's brief contained additional rationales and data analyses that were not explicated in the Acting Commissioner's February 2022 agency decision or the July 2022 Renewal Summary Report.

## II.

In reviewing an administrative agency determination, the court must "respect agency action taken pursuant to authority delegated by the Legislature." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp. ("Quest Academy"), 216 N.J. 370, 385 (2013). Thus, we should "not overturn an agency determination unless it is arbitrary, capricious, or unreasonable." In re Renewal Application of TEAM Acad. Charter Sch., 247 N.J. 46, 73 (2021) (citing In re Att'y Gen. Law Enf't Directives Nos. 2020-5 and 2020-6 ("In re Directives"), 246 N.J. 462, 489 (2021)). This standard "recognizes the 'agency's expertise and superior knowledge of a particular field,' as well as the Judiciary's 'limited role

. . . in reviewing the actions of other branches of government.'" Id. at 74 (quoting In re Directives, 246 N.J. at 489).

Accordingly, when reviewing an agency determination, the reviewing court "is limited to three inquiries":

> (1) whether the agency's action violates express or implied legislative policies—i.e. the law; (2) whether the record contains substantial evidence to support the agency's findings; and (3) whether the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Alcantara v. Allen-McMillan, 475 N.J. Super. 58, 64 (App. Div. 2023) (citing Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018)).]

So long as the "agency has satisfied these criteria, then [the reviewing court owes it] substantial deference," even if it would have reached a different result. Ibid. (citing In re Herrmann, 192 N.J. 19, 28 (2007)). The burden is on the party challenging the agency action—here, the School Board—to show that the administrative determination was arbitrary, capricious, or unreasonable. TEAM Acad., 247 N.J. at 73-74 (citing In re Directives, 246 N.J. at 489).

The applicable statute that guides us here is the Charter School Program Act, N.J.S.A. 18A:36A-1 to -18 ("CSPA"). In enacting the CSPA in 1995, the Legislature declared that the "establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy

of the State to encourage and facilitate the development of charter schools." N.J.S.A. 18A:36A-2. To that end, the State Board of Education has promulgated a series of rules to govern the implementation of the CSPA. N.J.A.C. 6A:11-1.1 to -6.4.

N.J.S.A. 18A:36A-4 outlines the procedure for applying to establish a charter school and bestows the Commissioner final authority to grant or reject an initial charter application. N.J.A.C. 6A:11-2.1 details the extensive charter application and approval process. Most pertinent to the present dispute, the regulations require the Commissioner to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence."[8] N.J.A.C. 6A:11-2.1(j). The Commissioner's initial grant of a charter is for a four-year period. N.J.S.A. 18A:36A-17.

Charter schools must be "open to all students on a space available basis." N.J.S.A. 18A:36A-7. A charter school cannot discriminate in its admissions policies and practices, although it "may limit admission to a particular grade level or to areas of concentration of the school." Ibid.

---

[8] "District of residence" is defined as "the school district in which a charter school facility is physically located; if a charter school is approved with a region of residence comprised of contiguous school districts, that region is the charter school's district of residence." N.J.A.C. 6A:11-1.2.

N.J.S.A. 18A:36A-8 details the admissions process for charter schools, including the use of a "random selection process" if the number of applicants is greater than the number of available spots. Once admitted, the student is automatically enrolled in the next grade, and a charter school is permitted to give "enrollment priority to a sibling of a student enrolled in the charter school." N.J.S.A. 18A:36A-8(b), (c). Notably, the statute requires a charter school's admissions policy to "seek the enrollment of a cross section of the community's school age population including racial and academic factors." N.J.S.A. 18A:36A-8(e).

Following establishment of the charter school, the Commissioner must "annually assess whether each charter school is meeting the goals of its charter." N.J.S.A. 18A:36A-16(a). The annual review includes, among other things, evidence that "[t]he school is achieving the mission, goals, and objectives of its charter as measured against the Performance Frameworks." N.J.A.C. 6A:11-2.2(a)(1)(i). The agency review also includes consideration of the curriculum, statewide assessment results, and parent and community involvement in the school. N.J.A.C. 6A:11-2.2(a)(1). Moreover, the Commissioner must annually "assess the student composition of a charter school and the segregative effect

that the loss of students may have on its district of residence." N.J.A.C. 6A:11-2.2(c).

In addition to the annual review, the Commissioner must also conduct "a comprehensive review prior to granting a renewal of the charter." N.J.S.A. 18A:36A-16(a). This "comprehensive review" includes the renewal application, the Performance Framework, annual reports, Statewide assessment programs, interviews, and "[t]he annual assessments of student composition of the charter school." N.J.A.C. 6A:11-2.3(b)(8).

N.J.S.A. 18A:36A-16(e) sets forth the types of material the Commissioner must review when conducting an overall evaluation of the charter school program, including:

> (4) the impact of the shift of pupils from nonpublic schools to charter schools;
>
> (5) the comparative demographics of student enrollments in school districts of residence and the charter schools located within those districts. The comparison shall include, but not be limited to, race, gender, socioeconomic status, enrollment of special education students, enrollment of students of limited English proficiency, and student progress toward meeting the core curriculum content standards as measured by student results on Statewide assessment tests[.]
>
> [N.J.S.A. 18A:36A-16(e).]

A charter may be renewed for a five-year period. N.J.S.A. 18A:36A-17.

The Commissioner may revoke a school's charter if the Commissioner concludes that "the school has not fulfilled any condition imposed by the commissioner in connection with the granting of the charter or if the school has violated any provision of its charter." Ibid. In the alternative, the Commissioner "may place the charter school on probationary status" to implement a remedial plan. Ibid. It is left to the Commissioner to "develop procedures and guidelines for the revocation and renewal of a school's charter." Ibid. N.J.A.C. 6A:11-2.4, in turn, addresses placing a charter school on probationary status and/or the charter revocation procedure.

Aside from this regulatory framework, "[c]ertain principles permeate our school laws," including the State's obligation to "ensure that no student is discriminated against or subjected to segregation in our public schools." In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch. ("Englewood"), 164 N.J. 316, 323 (2000). This obligation to prohibit segregation in New Jersey public schools extends to our charter schools. In re Renewal Application of TEAM Acad. Charter Sch., 459 N.J. Super. 111, 144 (App. Div. 2019), aff'd as modified by TEAM Acad., 247 N.J. at 46.

In this regard, the CSPA and accompanying regulations require the Commissioner "to monitor and remedy any segregative effect that a charter school has on the public school district in which the charter school operates." Red Bank I, 367 N.J. Super. at 471. N.J.A.C. 6A:11-2.1(j) provides that before the granting of a charter, the Commissioner "shall assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence." This demographic review includes addressing racial/ethnic segregation, and the impact on particular student groups, such as students with disabilities and ELL students. TEAM Academy, 247 N.J. at 79 (citing N.J.S.A. 18A:36A-16(e)(5)).

The Commissioner's obligation to engage in this assessment "is not contingent on a showing by the district of residence that the charter school would have such a segregative effect." TEAM Acad., 247 N.J. at 70 (citing Englewood, 164 N.J. at 328-29). This "obligation is imposed even if the district raises no concerns about the charter school's segregative impact."[9] Ibid. The obligation applies to review of initial applications, annual review, and—as here—renewal

_____

[9] In contrast, when discussing the fiscal harm that a charter school may impose on the district, the Court determined that the burden is on the party challenging renewal to make a preliminary showing of this harm; only if such a showing is made is the Commissioner required to analyze fiscal harm to the district. TEAM Acad., 247 N.J. at 78 (citing Englewood, 164 N.J. at 330-36).

applications. Id. at 70-71 (citing N.J.A.C. 6A:11-2.1(j); N.J.A.C. 6A:11-4.4(b); Red Bank I, 267 N.J. Super. at 472). Consequently, there is no burden on anyone to demonstrate segregative effect or demographic imbalance; rather the Commissioner is required to evaluate this as part of the responsibilities under the CSPA and accompanying regulations.

As observed by our Supreme Court in Quest Academy, "[d]espite all their detail, the statutory and regulatory programmatic requirements provide no guidance to the Commissioner on how to assess an application." 216 N.J. at 377. While this comment was about reviewing an initial application, it equally and logically applies to reviewing a renewal application. There is no codified provision specifying how the Commissioner should conduct the comprehensive review of segregative impacts, what demographic differences constitute an unacceptable segregative effect, and how to weigh any findings of segregative effect. Undoubtedly, however, "'the Commissioner must assess the racial impact that a charter school applicant will have on the district of residence in which the charter school will operate' and 'must use the full panoply of [her] powers to avoid' segregation resulting from the grant of a charter school application." Ibid. (quoting Englewood, 164 N.J. at 329) (alteration in original). Less clear is how

segregative effect is measured, and how extensive the Commissioner's assessment must be.

In Englewood, our Supreme Court identified a source for assessing segregative effect, referred to as the New Jersey State Guidelines on the Desegregation and Integration of Public Schools.  164 N.J. at 324-28 (citing State of N.J., Guidelines Governing School Desegregation/Integration (1989) [hereinafter the Guidelines]).  "The Guidelines provide a step-by-step methodology" for districts to determine "overall pupil population percentages for its racial groups" so that a district can address, for example, whether one school's pupil population is "substantially out of line" with that of another school within the same district. Id. at 325.  The Guidelines strived "to keep the school populations within expected ranges or to otherwise achieve in the students' learning environment appropriate mixtures of pupil populations that reflect the community's pertinent school age population."  Ibid.  The Court observed in Englewood that "the Legislature sought to achieve a comparable result" with charter schools, referring to the provision that a charter school "seek the enrollment of a cross section of the community's school age population, including racial and academic factors."  Ibid. (quoting N.J.S.A. 18A:36A-8(e)).

"In the wake" of the Court's Englewood holding, the DOE "promulgated two regulations codifying the Commissioner's duty to consider a charter school's segregative effect on its district of residence." TEAM Acad., 247 N.J. at 70 (citing 32 N.J.R. 3560(a) (Oct. 2, 2000)). Those regulations, N.J.A.C. 6A:11-2.1(j) and N.J.A.C. 6A:11-2.2(c), require the Commissioner to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence." Id. at 70-71 (quoting N.J.A.C. 6A:11-2.1(j)).

While these regulations codify the Englewood Court's general declaration that the Commissioner must consider segregative impact, there has been no explicit adoption of the Court's reference to the Guidelines as a methodology for this assessment. None of the published decisions interpreting the CSPA refer to the Guidelines or their methodology when discussing segregative effect.

Although the appropriate methodology to measure segregative effect is undefined, there is caselaw describing the form of such an assessment. When reviewing a charter renewal application, the Commissioner is "acting in his [or her] legislative capacity, not in a quasi-judicial capacity." Red Bank I, 367 N.J. Super. at 475 (citing In re Grant of Charter Sch. Application of Englewood on Palisades Charter Sch., 320 N.J. Super 174, 236 (App. Div. 1999)) (alteration in

original).  Hence, the Commissioner is not required to conduct a "full-blown hearing whenever a district board of education objects to the charter renewal of an existing school," nor must the Commissioner issue a decision with "the kind of formalized findings and conclusions necessary in the traditional contested case."  Id. at 476 (quoting, in the second instance, Englewood, 320 N.J. Super. at 217).  We stated in Red Bank I that the agency's rationale for charter renewal need "not be detailed or formalized"; it is sufficient if the agency's reasoning is "discernible from the record."  Ibid. (citing E. Windsor Reg'l Bd. of Educ. v. State Bd. of Educ., 172 N.J. Super. 547, 552-53 (App. Div. 1980); In re Allegations of Physical Abuse at Blackacre Acad., 304 N.J. Super. 168, 188 (App. Div. 1997)).

Even so, in Quest Academy, our Supreme Court clarified that the "arbitrary, capricious, or unreasonable standard applicable in the review of administrative agency decisions subsumes the need to find sufficient support in the record to sustain the decision."  216 N.J. at 386.  This "standard requires that the administrative decision be supported by the underlying record, regardless of the manner in which due process requires that the record be created."  Id. at 387. "The obligation that there be substantial evidence in the record requires a sifting of the record, and the ability to find support for the conclusions reached by the

27

Commissioner under the statutory framework within which [the Commissioner] must act." Ibid.

More pointedly with respect to the factor of segregative impact, the Supreme Court most recently instructed in TEAM Academy that:

> In future determinations of applications for approval of charter schools pursuant to N.J.S.A. 18A:36A-4.1 and -5 and N.J.A.C. 6A:11-2.1, applications for renewals of charters pursuant to N.J.S.A. 18A:36A-17 and N.J.A.C. 6A:11-2.3, and applications for amendments of charters pursuant to N.J.A.C. 6A:11-2.6, the Commissioner should address the impact of the charter school's approval, renewal or amendment on racial segregation in the district of residence. The Commissioner should also address the impact of the charter school's approval, renewal or amendment on the demographic composition of the district of residence with respect to two groups of students of particular concern to the Legislature, students with disabilities and students who are English language learners.
>
> . . . .
>
> The Commissioner's careful analysis of those issues, along with the other factors prescribed in the governing statutes and regulations, will further the Legislature's objectives in the [CSPA], satisfy the requirements of Englewood, and facilitate fair and effective appellate review of charter school determinations.
>
> [247 N.J. at 79-80 (citing N.J.S.A. 18A:36A-7; N.J.S.A. 18A:36A-16(e)(5)) (emphasis added).]

28

Although the Court in TEAM Academy did not specify exactly how the Commissioner "should address" segregative impact, its directive that "careful analysis" is necessary for "fair and effective appellate review" signifies these assessments are to be done explicitly. Ibid. Merely alluding to demographic data, without reasonably explaining the methodology applied to the data to gauge any unacceptable segregative impacts, does not suffice.

Here, the Acting Commissioner's renewal letter highlighted several points she considered as part of her comprehensive review but does not mention segregative impacts. The Renewal Summary Report recognized the DOE's obligation to conduct a demographic comparison, asserting on its second page the DOE had considered, in accordance with N.J.A.C. 6A:11-2.3(b), the "possible effect of charter school enrollment on district(s) of residence that could lead to segregation of students." Aside from that conclusory assertion, however, the Renewal Summary Report is bereft of any meaningful analytic discussion of segregative effects.

The Renewal Summary Report does contain charts and graphs displaying the percentages of enrollment of White, Hispanic/Latino, and other racial groups at RBCS and the comparative percentages of those racial groups at the district

schools. However, it does not explain why the manifest differences in those percentages are not indicative of segregation.

The Renewal Summary Report contains a series of tables addressing the RBCS's "Organizational Performance Framework," one of which states that the school meets the "Indicator 4.1 Access and Equity" standard for demonstrating "a commitment to serving and meeting the needs of all students," including special education pupils, ELL students, students who qualify for free or reduced-price lunches, and other underserved or at-risk populations. The narrative presented with that Indicator 4.1 finding does not mention segregative impacts, nor does it include a demographic comparison, although it does conclude that RBCS has maintained "accessible and equitable" application, admissions, lottery and enrollment practices, citing the weighed lottery and methods the school is using to recruit Hispanic/Latino applicants. On that same page, the Report further concludes as to Indicator 4.2 that RBCS "complies with state and federal special-education laws and provides a high-quality learning environment for all students."

Considered together, the Acting Commissioner's February 2022 renewal letter and the June 2022 Renewal Summary Report fail to analyze the demographic figures in a transparent manner that explains whether RBCS is

producing or perpetuating unacceptable segregative impacts within the school district. The renewal letter and Report do not disclose how the agency defines unacceptable "segregative impacts," nor why the Acting Commissioner apparently concluded that no such impacts exist. The Acting Commissioner's decision, on its face, does not reflect the "careful analysis" that the Supreme Court called for in TEAM Academy, 247 N.J. at 79, nor does it enable "fair and effective appellate review." Ibid.

Although the form of a charter school approval decision is generally left to an Education Commissioner's discretion, the Commissioner's rationale nevertheless must be discernible from the record, Red Bank I, 367 N.J. Super. at 475-76, and have sufficient support from the record, Quest Academy, 216 N.J. at 386. The Acting Commissioner's February 2022 decision, as supplemented by the Renewal Summary Report, does not satisfy these requirements. Her conclusions about the significance of the demographic comparisons and her assessment of possible segregative impacts are neither discernible from nor adequately supported by the record.

As the School Board argues, the data on its face could support an inference that a demographic imbalance has persisted between the enrollment at RBCS and the Red Bank district schools. In particular, the data for school year 2019-

31

2020 shows the White and Hispanic/Latino student proportions at RBCS were respectively 39.3% and 53.6%, whereas the proportions in the district schools were 7.1% and 84.7%. That disparity has narrowed since school year 2017-2018, when the White and Hispanic/Latino proportions at RBCS were 44.5% and 45%, and 7.3% and 83.8% within the district schools. Meanwhile, the record contains data showing that in school year 2020-21, the total K-8 school-age population in Red Bank was 16% White and 75% Hispanic/Latino, as compared with 39.9% and 52.5% at RBCS and 7% and 85.3% at the district schools, signifying that the demographic disparity at RBCS is less pronounced when compared with the local population than when compared with the district schools.

The Acting Commissioner's decision apparently infers from these and other demographic figures in the record that no untenable segregative effects are attributable to RBCS. But the Acting Commissioner's decision does not reveal the methodology used to reach that assessment, and does not articulate a methodology, metric, or weighing of specified factors, by which the Acting Commissioner measures segregative effect.

We note that our Supreme Court in Englewood, 164 N.J. at 325, referenced the step-by-step methodology of the Guidelines to establish a ratio

32

for district schools' population demographics, to model the overall pupil population percentages for its racial groups.[10] While it does not appear that the DOE has adopted this metric for charter school evaluations, the Acting Commissioner's decision identifies no metric, including any alternative metric, upon which she based her review. The decision does not address the School Board's contention that the existence of two schools with substantively different demographic populations, in and of itself, supports a finding of segregation. The decision further fails to explain why the demographic disparity is not attributable—as the School Board argues—to the existence of and admission practices at RBCS, or whether, as RBCS contends, the disparity stems from independent causes such as parental dissatisfaction with the district schools and migration to private and parochial schools.

The Acting Commissioner's decision also fails to analyze whether RBCS is causing unacceptable segregative impacts on the discrete categories of disabled students, ELL students, and economically disadvantaged students,

---

[10]   The Guidelines "establish[ed] a set of uniform criteria for school desegregation in New Jersey public schools." Guidelines, at 2. It described how to identify imbalanced enrollments based on racial/ethnic demographics, required schools to submit desegregation/integration plans, and provided a formula from which to compute "permissible deviation limits for each group of students." Id. at 8, 11, 14-15.

despite the Supreme Court's mandate in <u>TEAM Academy</u>, 274 N.J. at 79, to give "careful" scrutiny to those groups. At most, the narrative portions of the Renewal Summary Report only generically refer to RBSC's commitment to and services offered to such students, without analyzing their composition. The data contained in the record reveals that in school year 2020-21, the enrollment in the district schools consisted of 78.6% economically disadvantaged students, 32.4% ELL students, and 19.1% students with disabilities, whereas the RBCS enrollment that year consisted of 40.2% economically disadvantaged students, 12.1% ELL students, and 10.6% students with disabilities. The Acting Commissioner's approval letter and the Renewal Summary Report omit any discussion of why those disparities are inconsequential.

Another concern raised by the raw data is whether RBCS's weighed lottery and more robust recruitment practices have been producing sufficient enrollment of Hispanic/Latino students in the pre-kindergarten and kindergarten classes, which are key sources of new enrollments within this relatively small charter school. This was a major focus of the dispute in <u>Red Bank II</u>, (slip op. at 18-19). It was hoped at that time that the demographic mix of pre-kindergarten and kindergarten students would increase the ratio of Hispanic/Latino students and produce an ongoing reduction of segregative

A-1950-21

impacts, as those students rose through higher grades. However, the data in recent years has not borne out that expectation. Instead, the pre-kindergarten and kindergarten enrollment numbers have been relatively stable, with 20 White and 16 Hispanic/Latino students enrolled in those classes at RBCS in school year 2021-22, as compared with 17 Whites and 21 Hispanic/Latino students four years earlier in school year 2017-2018.

The Attorney General's appellate brief filed on behalf of the Acting Commissioner attempts to cure these various shortcomings by advancing, for the first time, various explanations and rationales for the final agency decision.[11]

---

[11] We do note in this regard that the brief supplies no definition or methodology for how the DOE ascertains unacceptable segregative impact. The brief asserts that "[u]sing the framework approved in Red Bank I, Quest and Englewood," the Acting Commissioner "conducted a holistic examination of the demographics of [the district schools] and RBCS and found that its operation would not have a segregative effect on the demographics of the district." The brief does not identify what definition of unacceptable segregative effect was applied, or what metric was used to determine if the disparities shown by the numbers were substantial enough to comprise such an effect. There is no assertion that the Acting Commissioner used any uniform and specified methodology to assess this point. As noted, the Guidelines cited in Englewood have not been explicitly applied since that decision, and no other decisions set forth any alternative methodology, benchmark, or normative factors from which to measure segregative effect. The brief further contends that because the racial composition of the district schools between 2017-2018 and 2020-2021 "remained similar in range," that means "there is no evidence that RBCS's operations [have] exacerbated racial imbalance in the district." But, again, it is unclear on what basis that inference is made, and why a static continuance of

We appreciate the Attorney General's important role as the "sole legal adviser" to State Government, N.J.S.A. 52:17A-4(e). However, "[a]n appellate brief is no place for an agency to try and rehabilitate its actions." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 139 (App. Div. 2013) (citing In re Petition of Elizabethtown Water Co., 107 N.J. 440, 460 (1987) (stating that an administrative order should be judged on the record, "not an after-the-fact affidavit purporting to explain the administrative agency's decision")); In re Orban, 461 N.J. Super. 57, 76-78 (App. Div. 2019) (discussing how an agency "must explain the specific reasons for its determination"). As we noted earlier, the Supreme Court in TEAM Academy emphasized the crucial responsibility of the Commissioner to perform a "careful analysis" of various demographic issues and "factors prescribed in the governing statutes and regulations" concerning charter school approvals or renewals. 247 N.J. at 79-80.

The after-the-fact rationales set forth in the brief submitted by the Attorney General, however cogent they may be, are no substitute for the Acting Commissioner's own analyses as the Cabinet officer responsible for

---

segregative impact would be acceptable. Thus, even if we were willing to rely on the Attorney General's brief to rehabilitate the Acting Commissioner's decision, it also does not provide a sufficient metric or methodology from which to determine whether the Acting Commissioner's decision was arbitrary, capricious, or unreasonable.

administering the education laws of our State.  See N.J.S.A. 18:4-23.  It is also not fair to the School Board as the appellant to have the agency's final decision fortified in such a post-decision, post-appeal manner by its lawyers.  The brief was not an amplification by the then-Acting Commissioner, even presuming (as we should) that she authorized its filing.[12]

Another important question of segregative impact not addressed by the Acting Commissioner is what is likely to occur if, hypothetically, RBCS's charter were revoked.  Assuming, arguendo, that RBCS were closed and all or virtually all its current students enrolled in the district schools, the White enrollment in the district schools would nearly double (rising from 6.2% to 10.2%), but Hispanic/Latino enrollment would remain at over 80%.  Such an outcome arguably might suggest that RBCS did not create a demographic imbalance in the district school, as absorption of its population seemingly would not yield a marked shift in student population.  Yet the Acting Commissioner did not explicitly consider how RBCS's potential closure would likely impact

---

[12]  We recognize that in Red Bank I, 367 N.J. Super. at 476 (App. Div. 2004), we discerned the grounds for the Education Commissioner's decision "from the entire record, including the . . . Commissioner's brief in th[e] appeal."  We decline to do the same here, given the intervening case law, including TEAM Academy and the published appellate opinions we have cited involving other state agencies in similar circumstances.

the district schools' demographics, or indeed whether the school's closure would result in an influx of White students to the district schools, as opposed to parents enrolling them in private or parochial schools instead.

We are mindful that, as we noted above, an Education Commissioner's determination of a charter school application does not have to adhere to a prescribed form, and that the Commissioner has a degree of flexibility in how to set forth the reasoning. But the special history of this long-standing controversy over the alleged segregative impacts of RBCS warrants more explanation than the Acting Commissioner has given on these critical segregative issues. We would be remiss in our responsibility as a reviewing court to validate the final agency decision "as is."

For these reasons, we are constrained to remand this matter to the current Acting Education Commissioner to address these important omissions from the February 1, 2022 final agency decision.[13] Specifically, on remand, the Acting

_____

[13] We decline the School Board's alternative requests that we appoint a Special Adjudicator, or that we exercise original appellate jurisdiction under Rule 2:10-5. The Court Rules do not permit the Appellate Division to appoint a Special Adjudicator, and we are unconvinced the quasi-legislative function of the Commissioner should be undertaken by or aided by a Special Adjudicator. The policy-laden and highly technical subjects for remand we have identified are also not suitable for this appellate court to resolve on original jurisdiction in lieu of the Commissioner. See Rudbart v. Bd. of Rev., 339 N.J. Super. 118, 127 (App. Div. 2001).

A-1950-21

Commissioner shall provide a written amplification addressing the following subjects:

- How does the DOE define impermissible segregative effect in a charter school renewal context? What extent of imbalance in the respective racial/ethnic demographics of the charter school and the district school is disallowed?

- How does the DOE measure segregative effect? What is the appropriate methodology, metric, or weighing of specified factors? Relatedly, how does the DOE ascertain whether the charter school's existence is causally responsible for a dearth of White students in the district schools? To what extent are external causal factors considered, such as the enrollment of students in private and parochial schools?

- Applying the definition of impermissible segregative impact and the DOE's metric/methodology to the data and other facts in the record, is the continued renewal of RBCS's charter producing such impermissible segregative impacts? Why or why not?

- Does the CSPA model the Guidelines cited in Englewood, which aim to avoid having two public schools within the same district co-

exist with substantively different student demographic populations? If not, why do the <u>Guidelines</u>, or at least their general principles, not apply?

- What is the Acting Commissioner's reasoned assessment of the disparities in the percentages of economically disadvantaged students, ELL students, and students with disabilities at RBCS as compared with the district schools? Are the disparities inconsequential and do they comport with the Supreme Court's admonitions in <u>TEAM Academy</u>?

- What is the Acting Commissioner's assessment of the relatively flat trend in the racial/ethnic composition of incoming pre-kindergarten and kindergarten students at RBCS? Does the trend signify that additional measures are warranted to recruit and admit new students that may abate segregative impacts?

- How does the Acting Commissioner forecast the likely effect on student population demographics within the district if RBCS were disbanded, and predict whether the school's disbandment would advance the goals of desegregation?

A-1950-21

On remand, the current Acting Commissioner in his discretion may invite further submissions from the parties. The Acting Commissioner also has the discretion to consider updated demographic data compiled from the intervening school year(s), provided the parties are afforded a fair opportunity to comment on that more recent data.

The remand amplification shall be issued no later than October 1, 2024. In setting that deadline, we recognize the litigation costs and uncertainties associated with a remand, and the concerns that parents and staff members at RBCS will have about the continued operation and viability of the school. We therefore instruct the agency and the parties to act expeditiously. We intimate no views on the appropriate outcome, and in the meantime, no stay of RBCS's operations is imposed.

Remanded in accordance with the terms of this opinion. We do not retain jurisdiction, but any party aggrieved by the remand may file a new appeal.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1950-21